144 P.3d 306 (2006)
In re the Marriage of Kimberly S. BOBBITT, n/k/a Kimberly S. Esser, Respondent, and
Ronald K. Bobbitt, Appellant.
Nos. 31997-7-II, 32727-9-II, 32603-5-II.
Court of Appeals of Washington, Division Two.
July 25, 2006.
*308 Philip A. Dunlap, Kent, WA, for Appellant.
Carol J. Cooper, Davies Pearson PC, John Russell Hickman, Tacoma, WA, for Respondent.
Virginia R. Ferguson, Tacoma, Guardian Ad Litem.

PART PUBLISHED OPINION
VAN DEREN, J.
¶ 1 Ronald Bobbitt appeals an order authorizing the 2004 sale of real property awarded to him in a 2002 dissolution decree and orders entered during a custody modification proceeding. He argues that the trial court[1] erred in (1) granting his former wife, Kimberly Esser, f/k/a Kimberly Bobbitt, authority to sell the "Yakima" property when the dissolution decree awarded the property to him; (2) denying his motion to remove the Guardian Ad Litem (GAL); (3) entering judgment against him for GAL fees; and (4) awarding attorney fees to Esser.
¶ 2 We hold that the trial court lacked the equitable power to authorize Esser's sale of Bobbitt's property and we remand for a hearing to determine a proper allocation of the net sale proceeds in Esser's attorney's trust fund and for consideration of Bobbitt's request for attorney fees relating to that issue. Additionally, we hold that the trial *309 court did not have sufficient information to determine the parties' relative need and ability to pay attorney fees and it failed to enter findings of fact or conclusions of law in support of its award of attorney and GAL fees, thus we vacate the fee awards and remand for rehearing. We affirm the trial court's denial of Bobbitt's motion to remove the GAL.

I. YAKIMA PROPERTY
¶ 3 When Kimberly Esser and Ronald Bobbitt dissolved their marriage in 2002, the decree (1) awarded Bobbitt the "Property located in Yakima, Washington" as his separate property; (2) assigned to Bobbitt the mortgage liability for the Yakima property; and (3) provided that Bobbitt "shall pay . . . [o]ne half of the parties' I.R.S. debt, both Federal and State (to be paid from proceeds of real property and vehicle sales.[) ]" Clerk's Papers (CP) at 646. Although he was not required to sell it, Bobbitt listed the Yakima property for sale immediately following entry of the decree. The decree did not contain a legal description of the Yakima property, although the assessor's tax parcel number and the legal description of the former family home, also awarded to Bobbitt, were properly included. The parties did not execute a quit claim deed or otherwise convey Esser's interest in the Yakima property to Bobbitt, and both parties' names remained on the mortgage.
¶ 4 In November 2002, the Yakima property mortgage holder informed Esser that Bobbitt had not made mortgage payments for four months and that he was not returning telephone calls. At oral argument, the parties clarified that the mortgage broker never commenced foreclosure proceedings, but following the telephone call from the mortgage holder, Esser voluntarily paid $580 to bring the payments current, made payments on the property, and paid two years' back taxes.
¶ 5 When an offer to purchase the property was made in October, 2004 Esser moved for permission (1) to sell the property with a special power of attorney allowing her to sign all documents necessary for the sale and (2) to place the proceeds of the sale in her attorney's trust account to facilitate the payment of her existing judgments against Bobbitt, including back child support and attorney fees and other sums she claimed he owed her. CP at 706. Esser's declaration in support of the motion acknowledged that the property had been awarded to Bobbitt but asserted that they had not executed a quit claim deed, so their names remained on the title and they were both liable for the mortgage. Before she received permission to execute the sale, she signed a purchase and sale agreement on October 8, 2004. Esser acknowledged to the trial court that the dissolution decree required that proceeds from the sale of real property be used for community debt, including a debt owed to her uncle, Dave Nelson. The court granted Esser's motion on November 5, 2004, and Esser sold the property in November, 2004. The proceeds remain in Esser's attorney's trust account pending further court order.
¶ 6 Bobbitt appeals. He argues that the trial court abused its discretion or acted beyond its jurisdiction in authorizing Esser to sell the Yakima property awarded to him as his separate property in the dissolution decree. We agree.
¶ 7 It has been the rule in Washington that the trial court does not have jurisdiction to order the sale of the parties' assets without their consent because there is no statutory grant of such power to a trial court. High v. High, 41 Wash.2d 811, 822-23, 252 P.2d 272 (1953); Arneson v. Arneson, 38 Wash.2d 99, 101, 227 P.2d 1016 (1951). Despite this rule, there are cases in which the trial court ordered a sale based on the facts of the case. Pugel v. Pugel, 74 Wash.2d 281, 444 P.2d 783 (1968); Murphy v. Murphy, 44 Wash.2d 737, 270 P.2d 808 (1954); Shay v. Shay, 33 Wash.2d 408, 205 P.2d 901 (1949); In re Marriage of Sedlock, 69 Wash.App. 484, 849 P.2d 1243 (1993); cf. In re Marriage of Trubner-Biria, 72 Wash.App. 858, 861, 866 P.2d 675 (1994) (noting that the court "does not have unfettered discretion to compel the sale of property in a dissolution of marriage."). But in each case the trial court's consideration of the issue occurred during the pendency of the case or at the conclusion of the trial, not after a full and final division of the property had been made, as occurred *310 here. And the issue of the court's jurisdiction to order sale of the real property was not raised, except in Sedlock. 69 Wash.App. at 501, 849 P.2d 1243.
¶ 8 In Sedlock, at the conclusion of the trial, the court divided the real property three-fifths to wife and two-fifths to husband as tenants-in-common, and ordered the property be placed on the market in a set amount of time at its fair market value. 69 Wash. App. at 498, 849 P.2d 1243. Furthermore, Sedlock distinguished High and Arneson but did not disagree with them. 69 Wash.App. at 502-503, 849 P.2d 1243.
¶ 9 Bobbitt relies on Byrne v. Ackerlund, in which the dissolution decree incorporated a property settlement agreement awarding a parcel of real property to Ackerlund and a $2,500 judgment to Byrne secured by a lien on the real property. Byrne, 108 Wash.2d 445, 739 P.2d 1138 (1987). Our Supreme Court held that the court of appeals improperly allowed Byrne's forced sale of the property to satisfy the lien because "the decree imposed on Ackerlund no obligation whatsoever to sell the property. Rather, Ackerlund's sale of the property can appropriately be viewed as a `condition precedent' to the accrual of Byrne's right to enforce payment on her liens." Byrne, 108 Wash.2d at 456, 739 P.2d 1138. The Court reasoned that "where one party holds title and the other a lien, the parties' respective interests are more removed [than in a tenancy in common]. A lien is merely an encumbrance to secure an obligation and involves no characteristics of co-ownership." Byrne, 108 Wash.2d at 450, 739 P.2d 1138.
¶ 10 Here, Bobbitt's argument is even more compelling because there was no property settlement agreement and the court did not give Esser a lien, security interest, or any other remaining interest in the Yakima property. Rather, the dissolution decree awarded the Yakima property in its entirety to Bobbitt, subject to payment of community debts if he sold it. Consistent with Washington law, even though the liability for the mortgage was assigned to Bobbitt, Esser was still subject to the mortgage owed the third-party community creditor, namely the mortgage holder. See 19 KENNETH W. WEBER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 14.11, at 278 (1997) ("distribution of the community property to the spouses does not prevent a community creditor from pursuing the former community property in the hands of either spouse. From the perspective of the creditor it makes no difference that the decree which terminated the marriage allocated the debt to be paid by one spouse or the other.").
¶ 11 The decree acted as a conveyance of the Yakima property between Bobbitt and Esser even though it did not contain the property's legal description. Esser knew that it was awarded in its entirety to Bobbitt even though the mortgage holder could collect payments from Esser if Bobbitt did not pay. Furthermore, Esser's attorney prepared and filed the dissolution decree without Bobbitt's signature, even though he was acting pro se, and there is nothing in the record on appeal to show that Bobbitt got actual notice of the presentation of the decree.
¶ 12 We construe the decree language against Esser under these circumstances. See Holaday v. Merceri, 49 Wash.App. 321, 322-23, 325, 742 P.2d 127 (1987) (noting that ambiguities in a separation agreement providing for the division of property, and incorporated into the dissolution decree, should be construed against the drafter/husband who was the only party represented by counsel when the parties entered into the agreement). Both Esser and Bobbitt knew that the Yakima property was awarded solely to Bobbitt. Esser's post-dissolution claim of being a co-owner of the property with Bobbitt has no basis in fact or law, nor can Esser assert a good faith misunderstanding of the property's status as Bobbitt's sole and separate property.
¶ 13 Furthermore, when Esser realized that Bobbitt was not paying the mortgage as ordered by the decree, she need not have paid back taxes or the missed and on-going mortgage payments until the property sold two years later. Those obligations were Bobbitt's. No foreclosure action was instituted that would have affected her credit rating. In fact, at oral argument the parties did not know whether either party faced the *311 possibility of a deficiency judgment on foreclosure.[2]
¶ 14 Esser's motion to allow her to sell the Yakima property and retain the net proceeds to satisfy her judgments against Bobbitt effected an improper modification of the 2002 property division. RCW 26.09.170(1) states in relevant part: "The provisions as to property disposition may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this state."
¶ 15 Not only did the decree award the Yakima property entirely to Bobbitt, but it also appears to allocate any sale proceeds for community tax debt and for a debt owed to Dave Nelson. Thus, the trial court erred when it allowed Esser to sell Bobbitt's property in Yakima to enhance her ability to collect her judgments against Bobbitt. Because the time for appeal had run on the property division, her remedy was to file a Civil Rule 60 motion to vacate the decree or enforce any judgments by process of law. See chapter 4.56 RCW.
¶ 16 A judgment lien encumbers real property owned by the judgment debtor in the county in which the trial court entered the judgment without the judgment creditor taking further action. BNC Mortgage, Inc. v. Tax Pros, Inc., 111 Wash.App. 238, 246, 46 P.3d 812 (2002). But a certified abstract of judgment from the original judgment county must be filed in any other county where the debtor owns property before the judgment lien encumbers the real property. RCW 4.56.200(4). Esser did not file her Pierce County judgments in Yakima County and thus did not encumber the Yakima property. RCW 4.56.200(4).
¶ 17 Here, the record discloses that when Esser obtained permission to sell Bobbitt's property in November 2004, she had Pierce County judgments against Bobbitt for unpaid child support and for attorney fees awarded in the modification action in June 2004. These judgments did not entitle her to take control of Bobbitt's real property without following the laws applicable to judgment creditors. Had she recorded her judgments in Yakima County, they would have been satisfied or removed with her permission when the property sold.
¶ 18 Furthermore, the proceeds from sale of the Yakima property appear to have been generally allocated for the parties' I.R.S. debt and for an unspecified debt to Dave Nelson by the dissolution decree. The decree also stated: "The parties have community funds due from Pierce County in the form of a Retainage Check in the approximate amount of $8,000.00. Said refund shall be applied to I.R.S. tax debt." CP at 647. Under paragraph 3.5, specifying Esser's liabilities, the decree further states: "Sale of the community assets, specifically the 1970 Ford Mustang; 1978 Ford Pick up; and any other miscellaneous property, including real property proceeds shall be applied to payment of the community debt, taxes and loan from Dave Nelson." CP at 647. The 1970 and 1978 vehicles were awarded to Bobbitt, as was all the parties' real property.[3]
¶ 19 The record does not show that the court considered the encumbrances imposed by the decree on the sale proceeds of the Yakima property, the $8,000 retainage fund, or sale proceeds from any vehicle when Esser was given permission to sell Bobbitt's property. Thus, we are unable to ascertain whether the money in Esser's attorney's trust fund should have paid taxes, Dave Nelson, or other community debts before Esser's later-acquired judgments were considered. We hold that the trial court abused its discretion when it allowed Esser to sell Bobbitt's *312 Yakima property in order for her to receive payment on her judgments.[4]
¶ 20 There is nothing in the record to suggest that the property was not purchased by an innocent third party for fair market value and the record indicates that two comparable sales were gathered to evaluate the offer. Bobbitt has not questioned the reasonableness of its sale price on appeal. Bobbitt asks that we remand to determine damages and attorney fees for having to defend Esser's motion to sell the Yakima property.
¶ 21 Because the dissolution decree addressed the distribution of sale proceeds and because Bobbitt listed the property for sale, we hold that he is not entitled to damages for its sale. But because of the decree's ambiguity regarding ultimate disposition of any sale proceeds and the insufficiency of the record supporting Esser's claimed interest in the remaining proceeds, we remand to the trial court to determine the proper distribution of the funds in Esser's attorney's trust account and for entry of such distribution order. We also remand Bobbitt's request for attorney fees for having to defend and further litigate Esser's sale of the Yakima property.[5]

II. MODIFICATION OF PARENTING PLAN AND GUARDIAN AD LITEM
¶ 22 Following their dissolution in February 2002, Esser and Bobbitt shared joint residential time with their 11-year-old son, K.B., according to a parenting plan that placed K.B. with Esser from Tuesday through Saturday and with Bobbitt for the remainder of the week.[6]
¶ 23 In February 2003, Esser petitioned to modify the parenting plan based on (1) K.B.'s integration into her family with Bobbitt's consent, in substantial deviation from the decree's parenting plan/residential schedule; (2) the detrimental effect on K.B.'s physical, mental, or emotional health resulting from the original parenting plan; and (3) the advantages of this change outweighing any harm from such a change. On the recommendation of Bobbitt's counsel and the parties' stipulation, the court appointed Virginia Ferguson as Guardian ad Litem (GAL) on March 20, 2003. Her fee agreement required that Esser and Bobbitt pay $150 per hour for normal working hours, $175 per hour for after hours, $50 per hour for her staff, and $25 for file set up costs. The Pierce County Superior Court Local Rules set $75 per hour as the presumptive hourly rate for GALs. Each party was to pay one-half of the GAL's fees, including a $1,500 retainer.
¶ 24 Bobbitt did not schedule an appointment with the GAL, provide written material to the GAL, or pay his share of the GAL's retainer right away due to his financial difficulties. On August 7, Bobbitt paid his share of the retainer with borrowed funds, and in September he requested an appointment with the GAL. Although the GAL's staff scheduled Bobbitt's interview with her in October, she had the appointment cancelled. *313 In a November 18, 2003 declaration, she explained:
When my office manager advised me of this appointment, I indicated to him that I had no information that would justify an appointment with Mr. Bobbitt, and before meeting with him, I would have to check with the attorneys in the case. My office manager called Mr. Bobbitt back and left him a message canceling the appointment, and indicating that I would be conferring with the attorneys. Mr. Bobbitt appeared on the appointed day, and I had to refuse to meet with him because another appointment had been scheduled for that time. I have not yet met with Mr. Bobbitt, nor has he or his attorney signed the contract requested based on the stipulated order appointing me.
CP at 45. At trial, she testified that she refused to see Bobbitt because she had had no contact with anyone regarding the case for five months and needed to check with the attorneys "to find out what was going on before [she] did anything more." RP (5/25/04) at 42.
¶ 25 The GAL steadfastly refused to interview Bobbitt or his witnesses, although she conducted 18 interviews with Esser, her witnesses, and others involved with K.B. between April 29, 2003 and February 2004. Seven of those interviews or conversations took place after Bobbitt requested a meeting with her in September 2003.
¶ 26 On February 18, 2004, Bobbitt moved to remove Ferguson as GAL, asserting that in refusing to investigate his side of the case she violated both the trial court's order appointing her and Superior Court Guardian ad Litem Rule 2 (GALR). The court denied the motion and awarded attorney fees to Esser for expenses incurred in opposing the motion.
¶ 27 The bench trial on Esser's petition for parenting plan modification began on May 25, 2004. The GAL testified and the court admitted her report over Bobbitt's objection. The court found that K.B. had been integrated into Esser's family with Bobbitt's consent and that the existing parenting plan was detrimental to the child.[7] The court adopted the GAL's findings and incorporated her report by reference in its final order. The court established Esser as the primary residential parent and limited Bobbitt to supervised visitation. The court also entered judgments against Bobbitt for $7,168.07 in back child support and $10,000 in attorney fees. The court awarded Esser the attorney fees "for the necessity of having to pursue this action." CP at 606.
¶ 28 On November 22, 2004, the GAL filed a motion and declaration seeking Bobbitt's unpaid GAL fees. The court entered judgment in favor of the GAL, awarding her $4,070.74 in unpaid GAL fees, even though she refused to interview him or his witnesses. Her motion was based on her GAL fee agreement and copies of her bills to Esser and Bobbitt.
¶ 29 Bobbitt argues that the trial court abused its discretion in admitting the GAL's report and testimony and by denying his motion to remove the GAL and to appoint a replacement GAL.
A. Standard of Review
¶ 30 Under title 11 RCW, the decision to remove a guardian is within the trial court's discretion. In re Guardianship of Dodson, 135 Wash. 625, 628, 238 P. 610 (1925); see also Vo v. Pham, 81 Wash.App. 781, 784, 916 P.2d 462 (1996) (appellate court reviews the trial court's determination of the need for a GAL for abuse of discretion).[8]
¶ 31 Similarly, admission of evidence is within the trial court's sound discretion, which we will not disturb on review absent a showing of abuse of discretion. State v. *314 Stubsjoen, 48 Wash.App. 139, 147, 738 P.2d 306 (1987). Abuse occurs when the trial court's discretion is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971). The appellant bears the burden of proving abuse of discretion. State v. Hentz, 32 Wash.App. 186, 190, 647 P.2d 39 (1982).
B. GAL's Duties
¶ 32 Bobbitt filed a motion to remove the GAL in February 2004. The court denied the motion and did not require that the GAL meet with Bobbitt or his references until he paid the GAL's fees. CP at 524. The court ordered the GAL to observe supervised visitation between Bobbitt and K.B. CP 524. An interview with the GAL was left to the GAL's discretion. But the judge advised that the decision regarding the parenting plan for K.B. would be based on K.B.'s best interests, not on the GAL's report. Ultimately, a different judge heard the trial, admitted the report and incorporated its recommendations into the final ruling.
¶ 33 Bobbitt argues that there were four reasons why the first judge should have removed the GAL and appointed a new one: The GAL (1) failed to report the child's expressed preferences regarding the parenting plan as required by RCW 26.12.175(1)(b) and the order appointing her; (2) did not represent the child's best interests when she refused to interview Bobbitt and his identified collateral contacts; (3) did not maintain independence, objectivity, impartiality and the appearance of fairness; and (4) gave advice to Esser. Bobbitt relies on the GALR, which define the role and manner of performance for GALs, to show that the GAL did not meet the expected standards of impartiality during her investigation.
¶ 34 It has long been a concern of the legislature that GALs, who are appointed in family law matters to investigate and report to superior courts about the best interests of the children, do their important work fairly and impartially. Following public outcry about perceived unfair and improper practices involving GALs, the legislature adopted RCW 26.12.175 to govern the interactions of courts and GALs and our Supreme Court adopted the GALR. These measures are intended to assure that the welfare of the children whose parents are involved in litigation concerning them remains the focus of any investigation and report, and that acrimony and accusations made by the parties are not taken up by an investigator whose only job is to report to the court after an impartial review of the parties and issues.
¶ 35 To that end, GALR 2 articulates the general responsibilities of GALs. As relevant here, it states:
[I]n every case in which a guardian ad litem is appointed, the guardian ad litern shall perform the responsibilities set forth below[:]
. . . .
(b) Maintain independence. A guardian ad litem shall maintain independence, objectivity and the appearance of fairness in dealings with parties and professionals, both in and out of the courtroom.
. . . .
(f) Treat parties with respect. A guardian ad litem is an officer of the court and as such shall at all times treat the parties with respect, courtesy, fairness and good faith.
(g) Become informed about case. A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. A guardian ad litem shall examine material information and sources of information, taking into account the positions of the parties.
. . .
(o) Perform duties in a timely manner. A guardian ad litem shall perform responsibilities in a prompt and timely manner, and, if necessary, request timely court reviews and judicial intervention in writing with notice to parties or affected agencies.
GALR 2 (emphasis added).
¶ 36 The evidence shows that Esser's attorney wrote a letter to the GAL asking her to conceal information from Bobbitt about an upcoming motion. The GAL's failure *315 to share this information with Bobbitt violates the appearance of fairness and she failed to treat Bobbitt with the respect due him as K.B.'s interested parent. GALR 2(b), (f). In addition, the GAL refused to meet with Bobbitt or to interview his references despite continuing the investigation and contact with other witnesses and despite knowing that he wanted to engage in the investigatory process well before trial. The GAL continually focused on payment of her bill rather than an investigation that would allow her to hear both sides of the story about K.B.'s parenting issues. In a letter to Bobbitt in December 2003, she states that she is not "clear on why it is [her] responsibility to call [Bobbitt] to set up an interview." CP at 194. The GAL also wrote that Bobbitt must "bring [his] bill current prior to the interview." CP at 194. This and subsequent letters recited the amount due from Bobbitt for his half of the investigation despite her refusal to interview him or his witnesses. She refused to be deposed by Bobbitt's counsel until Bobbitt paid an outstanding fee of $1,200 plus $450 for a deposition. According to the GAL's letters, the amount Bobbitt owed increased from a little over $600 to over $1,200 between January 16 and February 4, 2004.
¶ 37 The GAL's refusal to interview Bobbitt violated GALR 2(b), (f), (g), and (o), resulting in Bobbitt's well-founded concerns which he brought to the trial court's attention in his February, 2004 motion. But when the trial court learned of the nature of Ferguson's investigation it reminded the parties that its decision would not depend on the GAL's report but on its considered opinion of what was in K.B.'s best interests after hearing the evidence at trial. The court dismissed Bobbitt's complaints as typical dissatisfaction with a GAL who disagrees with one parent's position. The trial court also imposed CR 11 sanctions of $750 against Bobbitt for bringing the motion.
¶ 38 The trial court did not err in refusing to remove the GAL, but in failing to order the GAL to conduct a proper investigation according to the GALRs.[9] Furthermore, had the trial court directed the GAL to comply with GALR 2 to contact all parties and maintain an appearance of fairness, the appearance of partiality toward Esser and Bobbitt's concerns may have been avoided. But we do not hold that the trial court abused its discretion in refusing to remove the GAL because the court knew that the GAL still had adequate time to contact Bobbitt and his collateral contacts before trial and also knew that the investigation had involved impartial third parties to date.
¶ 39 Following the trial, the court agreed with Bobbitt that "the guardian ad litem probably could have done some things better." RP (6/1/04) at 581-82. The trial court specifically noted that (1) "it would have been important for the guardian ad litem to talk to [K.B.] about his preferences and his feelings regarding residence and where he would like to stay"; (2) "it would have been important for the guardian ad litem to talk to Mr. Bobbitt"; (3) "it would have been important for the guardian ad litem to get a report from the counselor directly to the judge . . . rather than filter what the counselor had said"; and (4) "it would have been important for the guardian ad litem to have more contact and more recent contact with [K.B.] tha[n] I have in the report." RP at 582. Yet the trial court concluded that the GAL reached the right conclusions about what was in K.B.'s best interests.
¶ 40 Bobbitt relies on In re Guardianship of Stamm v. Crowley, 121 Wash.App. 830, 91 P.3d 126 (2004), to challenge "the impact [the GAL's] actions and inactions had on the litigation of the case and the resulting influence she had on the trial court." Appellant's Br. at 19. But Stamm is inapposite. Stamm involved a GAL appointed under chapter 11.88 RCW when children petitioned for guardianship of their father and the case was tried before a jury. Stamm, 121 Wash.App. at 832-34, 91 P.3d 126. At trial, the GAL described her role as the "eyes and ears of the court," testified about Stamm's alleged incapacity, and stated that she had found certain witnesses "to be credible." Stamm, 121 Wash.App. at 840, 91 P.3d 126. Division One of this court held that the GAL had improperly testified about witness credibility *316 and had improperly aligned herself with the trial court to bolster her assessments, which created a substantial likelihood of affecting the jury's verdicts. Stamm, 121 Wash.App. at 840-41, 844, 91 P.3d 126.
¶ 41 In contrast, this case involves a GAL appointed under chapter 26.09 RCW to conduct an investigation in a parenting plan modification proceeding, which is heard without a jury. As noted in Stamm, a significant difference exists between a bench trial and a jury trial in that "there would be no occasion for such a description [of the GAL's role] in a bench trial, for a judge has no need to be told the GAL's role, and it has great capacity to mislead a jury." Stamm, 121 Wash.App. at 841, 91 P.3d 126. The court further reasoned, "Judges understand that the GAL presents one source of information among many, that credibility is the province of the judge, and can without difficulty separate and differentiate the evidence they hear." Stamm, 121 Wash.App. at 841, 91 P.3d 126.
¶ 42 Here, despite the deficient GAL performance, the totality of the record supports the conclusion that the trial judge independently evaluated the evidence. Both judges who heard Bobbitt's concerns about the GAL's performance articulated their independent assessment of the evidence and their proper focus on K.B.'s best interests.
¶ 43 Thus, we hold that despite the GAL's failure to abide by the rules that require (1) contact with all parties; (2) that all parties be treated with respect; (3) timely performance of a parenting investigation; and (4) independence, objectivity and the appearance of fairness, the trial court's findings of fact support its conclusion that the parenting plan was properly modified to make Esser the primary residential parent. And Bobbitt has failed to challenge any of the trial court's findings of fact, thus they are verities on appeal. Davis v. Dep't of Labor & Indus., 94 Wash.2d 119, 123, 615 P.2d 1279 (1980).
¶ 44 Furthermore, although the trial judge admonished the GAL for not asking K.B. about his residential preferences, K.B. had not personally expressed his parenting plan preferences to the GAL. According to the GAL, K.B. mentioned his parenting plan preferences to a counselor after "[h]e had already been primed by his father. He knew my name. He knew what I was supposed to do. And he said, `I want you to tell her that I want to live with my dad.' That is not exactly what I would call an independent process by the child."[10] RP (5/25/04) at 120. The GAL further testified that she does not ask children which parent they want to live with because it puts the child "in the middle of a contested situation like this one." RP at 121.
¶ 45 Accordingly, we hold that the trial court did not abuse its discretion in denying Bobbitt's request to remove Ferguson as the GAL and to appoint a new GAL in February 2004.

III. ATTORNEY AND GAL FEES AND COSTS
¶ 46 Bobbitt next argues that the trial court abused its discretion in awarding attorney fees to Esser because Esser did not file a financial declaration and, thus, the court did not have sufficient information to make a determination of need and ability to pay under RCW 26.09.140. He also challenges the fees and costs awarded to the GAL in light of her failure to properly perform her duties as a GAL.
A. Attorney Fees
¶ 47 An award of attorney fees under a statute or contract is a matter of trial court discretion, which we will not disturb absent a clear showing of an abuse of that discretion. Fluke Capital & Mgmt. Servs. v. Richmond, 106 Wash.2d 614, 625, 724 P.2d 356 (1986). It is well settled that "[a] trial court may consider whether additional *317 legal fees were caused by one party's intransigence and award attorney fees on that basis." In re Marriage of Greenlee, 65 Wash.App. 703, 708, 829 P.2d 1120. "When intransigence is established, the financial resources of the spouse seeking the award are irrelevant." In re Marriage of Morrow, 53 Wash.App. 579, 590, 770 P.2d 197 (1989). Intransigence includes foot dragging and obstruction, filing repeated unnecessary motions, or making the trial unduly difficult and costly by one's actions. Greenlee, 65 Wash. App. at 708, 829 P.2d 1120.
¶ 48 Bobbitt asserts that the trial court did not have sufficient information to determine the parties' relative need and ability to pay. He is correct. While the record contains testimony from Esser detailing her monthly income, her expenses incurred in child rearing, and her costs resulting from this litigation, for which Bobbit had not reimbursed her, it does not include her new husband's income or the household expenses, debt, or assets. See CP at 596-600 (child support worksheets show only the gross and net income for mother, and nothing about her assets or other household income).
¶ 49 Esser argues that the trial court based the fee award on Bobbitt's intransigence throughout the proceedings. But the trial court made no findings about the attorney fee award. It merely stated that $10,000 in attorney fees was awarded "for the necessity of having to pursue this action." CP at 606. The trial court must provide sufficient findings of fact and conclusions of law to develop an adequate record for appellate review of a fee award. Mahler v. Szucs, 135 Wash.2d 398, 435, 957 P.2d 632 (1998). Thus, we vacate the judgment for attorney fees and remand for a new hearing on attorney fees based on adequate information and for entry of specific findings of fact and conclusions of law regarding any attorney fee award.
B. GAL Fees
¶ 50 Because Bobbitt did not pay one-half the GAL fees at the close of the custody action, the GAL filed a motion and declaration seeking a judgment against him for the remaining $4,070.74 of her fees. The court granted the motion. Bobbitt appeals the trial court's award of these fees. Esser[11] argues that the trial court had no discretion to refuse to award the fees to the GAL, relying on RCW 26.12.175(1)(d) that states, "[t]he court shall enter an order for costs, fees, and disbursements to cover the costs of the guardian ad litem." We disagree with Esser's limited interpretation of the statute and we grant Bobbitt's request for relief from the judgment.
¶ 51 The trial court retains the discretion to evaluate the fees and costs requested by the GAL and enter an appropriate order. In fact, the order appointing the GAL states that the trial court shall make such an award only after considering the GAL's accounting for the time and costs.
¶ 52 The record contains a copy of the GAL's "Contract to Pay Fees and Costs" signed in December 2003. This agreement sets fees and costs considerably in excess of the amount available to GALs without such an agreement. But the order appointing Ferguson states:
3.5 PAYMENT OF FEES AND COSTS
The guardian ad litem fee is $per panel guidelines per hour up to $____ (handwritten interlineation as follows: on agreement based on stipulation) the maximum the guardian ad litem may charge without additional court review and approval.
The fees and costs of the guardian ad litem paid as follows:
[X] 50% by father and 50% by mother.
. . . .
The total amount awarded shall be at the discretion of the court up to the maximum amount allowed after the guardian ad litem files an itemized statement of time with the court, along with a specific request for fees and a proposed Order.
CP at 9-10 (emphasis added).
¶ 53 It appears that the trial court awarded the GAL's requested fees solely based on *318 her itemized statement of time spent investigating this matter and on the signed agreement. But the order appointing the GAL expressly reserves the trial court's discretion over GAL fees. The trial court heard the entire trial and should have considered the total fees charged and the nature of the work performed, including the GAL's failure to meet with, contact, or interview Bobbitt and his collateral sources before it awarded the fees. In fact, although the court expressly acknowledged the shortcomings of the GAL's work, it did not enter findings of fact and conclusions of law addressing Bobbitt's arguments about the GAL's investigatory shortcomings in its award of fees. Instead, it simply imposed 50 percent of the charged fees and costs on Bobbitt. Given the dispute and the evidence of the GAL's violations of GALR 2 such findings were necessary here. The trial court was not bound by the parties' stipulation to fees and we reverse and remand for hearing on the GAL fees.
¶ 54 Esser requests attorney fees on appeal, arguing that Bobbitt's appeal is frivolous and that his conduct constitutes intransigence. But Bobbitt has prevailed on the issues of Esser's sale of his Yakima property, the attorney fees awarded to Esser, and GAL fees. Furthermore, we recognize that Bobbitt was correct that the GAL's conduct fell below the required standards for an impartial and thorough GAL. We thus deny Esser's request for attorney fees on appeal.
¶ 55 We reverse and remand for determination of the distribution of the remaining proceeds from the sale of the Yakima property and for reconsideration of the proper allocation of attorney fees and GAL fees between the parties.
We concur: HUNT, J., and QUINN-BRINTNALL, C.J.
NOTES
[1] Three superior court judges heard parts of this case and the decisions Bobbitt challenges were made by different judges.
[2] A judicial foreclosure under chapter 61.12 RCW could have resulted in a deficiency judgment whereas a non-judicial foreclosure under chapter 61.24 RCW, under most circumstances, would not.
[3] Furthermore, the decree can be interpreted to require the sale proceeds to pay only Bobbitt's one-half of the obligations or both parties' obligations. Because the vehicles and the real property were awarded to Bobbitt as his separate property, it is logical that the proceeds were intended to satisfy only his debts, but because the findings of fact are not part of the record on appeal and the decree does not state the debt amounts or the asset values, we cannot ascertain those amounts or values.
[4] At the hearing on Esser's motion to sell the property, Esser's counsel claimed equitable estoppel applied. To apply the doctrine there must be:

(1) acts, statements, or admissions inconsistent with a claim subsequently asserted, (2) action or change of position on the part of the other party in reliance upon such acts, statements, or admissions, and (3) a resulting injustice to such other party, if the first party is allowed to contradict or repudiate his former acts, statements, or admissions.
Fritch v. Fritch, 53 Wash.2d 496, 505, 335 P.2d 43 (1959) (internal quotation marks omitted).
Bobbitt is not estopped from challenging the sale based on the decree. It contained a hold harmless provision allowing Esser reasonable attorney fees to defend collection of a debt allocated to Bobbitt. And Esser has never produced any evidence that a foreclosure action was commenced or about to be commenced. In the trial court, Esser noted that the proceeds from the sale would be used to satisfy community debt. She has not argued that application of the funds on appeal.
[5] We remand for further determination the distribution of sale proceeds as well as attorney fees. Because these decisions were by different judges, we recognize that more than one hearing may be necessary, but we leave to the superior court how to assign the remanded hearings.
[6] During the pendency of the modification proceeding, the parties stipulated to a temporary modification of the parenting plan to allow K.B. to reside primarily with his mother and to visit his father on alternating weekends.
[7] The court specifically found that (1) the shared custody arrangement resulted in K.B.'s poor behavior and school work, especially after visitation with Bobbit; (2) Bobbit's behavior involving K.B. in the custody proceedings had a negative effect on K.B.'s behavior towards Esser and his school work; and (3) Bobbit's behavior constituted disruption requiring supervised visitation.
[8] Though there is a dearth of case law on this issue in title 26 RCW cases, the parties agree that abuse of discretion is the proper standard of review for a motion to remove a GAL.
[9] Bobbitt has not appealed the $750 sanction imposed.
[10] During her testimony, the GAL cited RCW 26.09.187 in remarking that K.B. did not exhibit "sufficient maturity and independent evaluation" and that she did not believe "that [K.B.] has the ability to make an independent and reasoned assessment of what is in his best interest." RP (5/25/04) at 119. See RCW 26.09.187(3)(a)(vi) (enumerating "the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule" as a criterion to consider in establishing a permanent parenting plan).
[11] Esser argued the issue of the GAL fee award and the GAL submitted a declaration endorsing Esser's arguments.