IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Matter of the Interest of: | ) | |
| | ) | No. 32519-9-III |
| S.W. and J.W., | ) | |
| | ) | |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

KORSMO, J. — G.W. and D.W., respectively the father and mother of S.W. and
J.W., appeal from an order terminating their parental rights.[1] We affirm.

## FACTS

The Department of Social and Health Services (DSHS) received reports in the
spring of 2009 that the appellants were dealing drugs out of their home. A social
worker's visit showed unsafe conditions. The parents initially voluntarily placed the
children in out-of-home care, but revoked that placement and DSHS returned the children
to D.W. and filed a dependency petition. D.W. worked with DSHS to remedy conditions
and the children were returned in August 2009. The dependency was dismissed.

---

[1] D.W. has another son, whose initials are also D.W., from an earlier relationship.
He is not a subject of this action.

In November 2010 the children were in D.W.'s sole care as G.W. was in prison in Nevada. D.W. failed to pick up D.W. and S.W. after school one Friday. Police were called and the children were turned over to Child Protective Services (CPS). A deputy sheriff also found the younger child, J.W., at the home of a known drug user. J.W. also was taken to CPS. The following Monday afternoon, D.W. contacted DSHS. She explained that a friend was supposed to pick the children up for her.

A child abandonment charge was filed against D.W. and another dependency action was filed involving S.W. and J.W.[2] Orders of dependency and disposition orders were entered in the spring of 2011 against both G.W. and D.W.[3] The orders required both G.W. and D.W. to undergo chemical dependency treatment, random urinalysis testing, domestic violence evaluations, and psychological and mental health evaluations. With respect to G.W., the order took effect when he was released from prison in Nevada in late 2011.

The children went through a series of foster homes during the two years of the dependency, finally ending up in a home in Oregon interested in adopting the children. The children showed little attachment to either of their parents and, on occasion, fear of them. The parents both initially participated in supervised visitation with the children,

---

[2] Son D.W. went to live with his father and was not a subject of the dependency.

[3] D.W. also was convicted of third degree abandonment of a dependent person.

2

but some of the supervised visitation providers banned the couple from their services after threatening and abusive behavior, some of which occurred in the presence of the children. By May 2013, D.W. had stopped visiting.

G.W. took part in three classes while in the Nevada prison, but DSHS did not credit him for any of them as it had no knowledge of the curriculum. G.W. took part in couples counseling for two months[4] upon his release and also mental health counseling with Dr. Robinson through Tapio Counseling. Dr. Robinson evaluated G.W. for domestic violence and recommended a 52-week treatment program. G.W. sought to also use Dr. Robinson for domestic violence treatment, but DSHS policies did not permit the same provider to address both mental health and domestic violence treatment. It referred him to Social Treatment Opportunities Program (STOP) for domestic violence treatment, but G.W. refused to engage with STOP. He also refused to undergo urinalysis. He did complete a psychological evaluation with Dr. Scott Mabee who diagnosed an antisocial personality disorder (with unstable mood and egocentric features), mild mood disturbances, depression, and opiate dependency.

The guardian ad litem (GAL) assigned to the children was Linda Whitaker. Ms. Whitaker or someone from her agency visited the children in their first foster home. She visited the children in their second foster home both in person and via Skype. She also

---

[4] Sometime during the dependency, G.W. and D.W. decided to end their marriage.

3

met with each child individually during September 2013. She did not visit the parents in their homes and did not see them interact with the children during the supervised visitations.

Trial was held in Ephrata over eight days[5] beginning September 12, 2013 and ending January 30, 2014.[6] Counsel for G.W. was from Ellensburg, counsel for D.W. was from Spokane, the assistant attorney general representing the State was from Wenatchee. Both G.W. and D.W. were living in Spokane at the time of trial. Counsel for D.W. never had contact with her and D.W. did not attend the trial. G.W. had difficulties traveling to Ephrata. DSHS arranged for volunteers to drive to Spokane and bring G.W. to the trial. G.W. did not have a stable address and would have to notify his counsel where he needed to be picked up. The system failed on one occasion in November when the volunteer went to the wrong address. The trial judge compensated for this absence by not hearing testimony. G.W. also missed the two October hearing dates due to his incarceration in Spokane.

On January 29, 2014, G.W. contacted his attorney in the late afternoon to advise that he would need a ride to the following day's trial and gave the address where he could be picked up. Counsel promptly contacted DSHS, but was advised that it was too late in

---

[5] The seven trial dates in 2013 were September 12, 13, 26, October 24, 25, November 7, and December 5.

[6] S.W. was nine years old and J.W. five years old at the beginning of trial.

4

the day to find a volunteer. G.W. did not appear for trial the next day and his counsel sought a continuance, pointing out that this was the day for G.W. to put on his case.[7] Counsel did not make an offer of proof concerning any proposed testimony by her client. The court denied the request and had counsel call her client and determine if he would appear telephonically. She reached him, but he declined to appear by telephone.[8] The court explained at some length why the continuance would be denied, noting the numerous accommodations made for G.W. during the trial and indicating that the difficulty of gathering counsel together made it likely another month or two would pass before the trial could resume.

G.W.'s counsel then called two witnesses, telephonically, before resting. There were no additional witnesses and the case proceeded to argument. The guardian ad litem, Ms. Whitaker, made a brief statement recommending termination of the parent-children relationship as being in the best interests of both children. With respect to G.W., she stated that the children did not feel safe around him and that he was scary. Report of Proceedings (RP) (Jan. 30, 2014) at 1360.

---

[7] G.W. had been called to testify by the State early in the trial, but his counsel had declined to examine her client and reserved his testimony to the defense case.

[8] No explanation was given for this decision, but the record suggests that he did not have permission to use the telephone at which his counsel was able to reach him.

5

The court took the matter under advisement and returned its decision before counsel in the courtroom three weeks later. In a 27 page summary of findings and reasoning on the record, the court did not mention the guardian ad litem at all. The court ordered that the parent-child relationship be terminated with respect to each parent and each child. He cited numerous deficiencies that G.W. had been unable to address and would not be able to address in a timely manner despite appropriate services being offered or provided. Specifically, the court found that G.W. had not started on chemical dependency or domestic violence treatment. The court also detailed several deficiencies that left G.W. unable to parent his children. In particular, the court noted that his bond with the children was nonexistent and that his parenting skills were unlikely to be fixed. He also had no empathy for the children and it was unlikely that any bond could develop because both children suffered from reactive attachment disorder.

Appropriate findings in support of the decision were entered. Each parent then timely appealed to this court.

## ANALYSIS

D.W. presents a single issue in this appeal; she alleges a due process violation based on the guardian ad litem's alleged failure to provide adequate services. G.W. alleges that he was denied due process because he did not attend the final day of trial, takes issue with whether he was offered all appropriate services, and also contends that

6

No. 32519-9-III
*In re S.W. & J.W.*

the court prematurely terminated the parent-child relationships. We address the claims in the order listed, beginning with the mother's contention.

*Guardian ad Litem Services*

D.W. contends that her due process right and her children's due process rights were violated by the guardian ad litem allegedly conducting an inadequate investigation of the case.[9] The State raises several responses to this argument, including lack of standing and lack of manifest constitutional error. While we question standing,[10] we do not address it (or any of the State's other responses) because we agree that there was no manifest constitutional error.

This issue is framed by RAP 2.5(a). That rule provides that an appellate court will not consider an issue on appeal which was not first presented to the trial court. RAP 2.5(a); *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988). However, RAP 2.5(a)(3) permits a party to raise initially on appeal a claim of "manifest error affecting a constitutional

---

[9] D.W. also takes issue with the corresponding finding of fact, no. 2.17, that the GAL had regular contact with the children throughout the dependency and termination case. We believe that the evidence does support the finding, noting the evidence cited earlier concerning the visits with the children, and will not further address the issue in light of our resolution of the primary issue.

[10] The GAL represents the children, not the parents. RCW 13.34.105(1). Accordingly, we question D.W.'s standing to present a challenge to the performance of the GAL for the first time on appeal as a parent's personal due process right. We also question whether a parent has standing to assert the children's interests in a termination action. *E.g.*, *In re Marriage of Akon*, 160 Wn. App. 48, 59, 248 P.3d 94 (2011) (stepparent could not assert children's rights in dissolution).

7

right." *Id.* at 684. The error must be both (1) manifest and (2) truly of constitutional magnitude. *Id.* at 688. A claim is manifest if the facts in the record show that the constitutional error prejudiced the defendant's trial. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). However, if the necessary facts are not in the record, "no actual prejudice is shown and the error is not manifest." *Id.*

The termination of parental rights statute provides a two-step process: the first step focuses on the adequacy of the parents, which must be proven by clear, cogent, and convincing evidence, and the second step focuses on the child's best interests, which need only be proven by a preponderance of the evidence; only if the first step is satisfied may the court reach the second. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). When assessing the adequacy of the parents, RCW 13.34.180(1) lists six elements that the State must prove.

The best interest of the child is represented by the GAL. *See In re the Dependency of J.B.S.*, 122 Wn.2d 131, 856 P.2d 694 (1993) (in a dependency proceeding, it is the duty of the guardian ad litem to represent the best interest of the child). In performing this function, a GAL must meet the requirements of RCW 13.34.105(1), which include:

> (a) To investigate, collect relevant information about the child's situation, and report to the court factual information regarding the best interests of the child;
>
> (b) To meet with, interview, or observe the child, depending on the child's age and developmental status, and report to the court any views or positions expressed by the child on issues pending before the court;

...

(f) To represent and be an advocate for the best interests of the child;

RCW 13.34.105(1)(a), (b), (f).

Guardian ad litems are also subject to the Guardian Ad Litem Rules (GALR). These rules provide GALs with minimum requirements, including: acting on behalf of the best interest of the child, maintaining independence and the appearance of fairness, and informing the court. GALR(2)(a), (b), (i). Additionally, the rules speak to the sufficiency of a GAL's investigation. A GAL must:

> **(g) Become informed about case**. A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. A guardian ad litem shall examine material information and sources of information, taking into account the positions of the parties.

GALR (2).[11]

A GAL's performance of these duties is considered in light of heightened due process requirements afforded to parents and children alike in termination proceedings. *See Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Due process includes the procedural right to be heard and the substantive right to have an accurate determination by the court. *State v. Santos*, 104 Wn.2d 142, 147-149, 702 P.2d

---

[11] "These measures are intended to assure that the welfare of the children whose parents are involved in litigation concerning them remains the focus of any investigation and report, and that acrimony and accusations made by the parties are not taken up by an investigator whose only job is to report to the court after an impartial review of the parties and issues." *In re Marriage of Bobbitt*, 135 Wn. App. 8, 25, 144 P.3d 306 (2006).

1179 (1985). In determining whether a procedure violates due process, a court considers three factors: (1) the parents' interest, (2) the risk of error created by the procedures used, and (3) the countervailing government interest supporting use of the challenged procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). A GAL's violation of a mandatory statutory requirement and GALR does not necessarily amount to a due process violation. *See In re Dependency of P.H.V.S.*, 186 Wn. App. 167, 182-183, 339 P.3d 225 (2014) (failure of an incapacitated *parent's* GAL to appear at the morning session of the third day of a dependency hearing in violation of statute was also a due process violation, but harmless error).

With these principles in mind, we conclude that this allegation does not present an issue of manifest constitutional error. First, it does not appear that there was any error here. The GAL was an active participant at trial, testifying and examining witnesses as well as giving a brief statement during closing argument. Counsel for D.W. cross-examined the GAL briefly, but did not ask any questions concerning her investigation.[12] D.W.'s argument on appeal addresses how well the GAL did her job, but no evidence was presented at trial concerning whether the GAL was required to do other than she did. The statute imposes a duty to investigate, but the particulars of the investigation are left to the

---

[12] Counsel for G.W. did question the GAL about the fact that she had not observed the parents' visitation with the children (GAL was afraid of making volatile situation worse) and had not interviewed the parents. Report of Proceedings (RP) 951-953.

GAL, other than a duty to meet with or observe the child. RCW 13.34.105(1). D.W. has not established that the GAL had an obligation to meet with the parents or observe them interact with the children. On this record, we doubt that there was any error.

But, even if there was an obligation to do more, any error also would have been harmless. The trial judge did not mention the GAL once in the lengthy rendition of the court's judgment. There was no mention of the GAL's investigation. The written findings only reflect that the GAL did her job. These facts are unsurprising since the focus of a termination trial is on whether the State established the six elements of RCW 13.34.180(1), all of which address the parent and the services made available to her, as well as the parent-child relationship and the best interests of the child. The activities of the GAL are simply not among the issues of proof at a termination proceeding.

Accordingly, we conclude that D.W. has failed to establish any prejudice from the alleged deficiencies of the GAL's performance in this case. The alleged error therefore is not manifest. RAP 2.5(a)(3).

*Attendance at Trial*

The first issue G.W. presents is whether his due process rights were violated by his absence from the final day of trial. He does not challenge the court's denial of his request for a continuance, but does contend that trial should not have finished in his absence. We conclude that he has not established a due process violation.

11

As noted previously, these types of due process challenges are adjudged under the flexible *Mathews* balancing test. *In re Welfare of L.R.*, 180 Wn. App. 717, 724, 324 P.3d 737 (2014). That test looks to the (1) interest at issue, (2) the risk of error created by the procedure, and (3) the countervailing government interest in using the procedure. *Mathews*, 424 U.S. at 335. In this appeal only the second factor is seriously at issue. The State concedes that the first factor weighs in G.W.'s favor given his fundamental liberty interest in parenting his children, while he concedes that the final factor weighs in the State's favor. The question remaining, then, is whether denying the continuance and proceeding in G.W.'s absence created a risk of error. Under these facts, it did not.

"The second factor assesses whether the hearing had sufficient procedural safeguards to ensure that the parent had a full and fair opportunity to defend—i.e., to present evidence, rebut opposing evidence, and present legal arguments." *L.R.*, 180 Wn. App. at 725. That standard is satisfied here. G.W. had been present for much of the trial and already had testified, although he had reserved the right to testify again in his case-in-chief. The trial court offered G.W. the chance to appear telephonically. He also was represented by counsel for the entire trial, which had previously been extended once to accommodate his travel difficulties. His counsel called two additional witnesses on his behalf on the final day, indicating that the defense was ready to proceed, but made no offer of proof concerning what more G.W. would have testified about or why he could

12

only do so in the courtroom.[13] Under these facts, there simply is no reason to believe that G.W.'s absence contributed to the risk of an erroneous decision. The trial court provided him a process to present any additional evidence he might have had. Therefore, we conclude that this *Mathews* factor favors the government.

Although G.W. had a fundamental interest in parenting his children, that interest does not outweigh the fact that his presence on the last day of trial did not increase the risk of an erroneous decision. In light of the important governmental interest in bringing finality to the children, extending the then 38-month dependency and the trial, which itself was in its fifth month, was not justified. The second and third *Mathews* factors do not favor G.W.'s argument here. Accordingly, we conclude there was no due process violation in declining to extend trial to secure G.W.'s presence to testify about unknown matters.

There was no due process violation.

*Provision of Services to G.W.*

G.W. next raises a series of arguments concerning whether or not he was provided adequate services that would have allowed him to continue to parent his children. We agree with the trial court that the appropriate services were offered.

---

[13] Nor was any post-trial motion for relief filed suggesting what new evidence would have been presented if G.W. had testified.

At issue is RCW 13.34.180(1)(d):

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

It is the State's burden to establish this factor by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a)(i).

This factor requires DSHS to offer all necessary services capable of correcting G.W.'s parental deficiencies within the reasonable future. *In re M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (2008). DSHS must tailor the services it offers to meet each individual parent's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). It must provide all court ordered and necessary services to the parent. *In re Dependency of D.A.*, 124 Wn. App. 644, 651, 102 P.3d 847 (2004). A service is "necessary" if it is needed to address a condition that precludes reunification of the parent and child. *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010).

G.W. contends that this factor was not established. He argues (1) DSHS failed to give him properly tailored services because it did not investigate the courses he completed in Nevada, (2) failed to provide domestic violence treatment in group therapy, and (3) failed to offer necessary family therapy and therapeutic visitation. We address each contention in the order stated.

14

The first argument fails on the record. A social worker testified that she received the certificates of completion from G.W., but the courses had not been approved by DSHS and she had never seen the course curricula. RP 1120-1121. G.W. contends that DSHS should have then investigated the courses and reassessed him. This argument misses the mark because it was the court, rather than DSHS, that entered the order requiring G.W. to complete the services. That order was based on the information known to the court in view of the documented problems uncovered during the dependency. If G.W. believed that the prison courses were the equivalent of any that DSHS was offering him, he was free to prove that to DSHS or the trial court and ask for credit and/or a new assessment. He did not. He presents no authority that either DSHS or the trial court was required to act on the certificates and attempt to determine if they bore on the existing court order.

DSHS is not required to offer services outside of the agency or the community. RCW 13.34.136(2)(b)(vii). Here, DSHS had no control over the out-of-state prison and no ability to provide services there. Accordingly, the court ordered that services be provided upon G.W.'s release from prison. We are aware of no authority that required the court to update that order merely because G.W. completed a prison sentence and may or may not have made good use of his time there. If G.W. had any information of significance to the order, he was free to provide it, but we discern no duty on the part of

15

either DSHS or the trial court to reevaluate G.W.'s circumstances at the time of release from custody.

G.W.'s second argument is that he was not provided group domestic violence therapy. That claim fails factually. He was offered the services of STOP, but he refused to go there because he preferred to stay with his existing services with Dr. Robinson. The statute merely requires DSHS to "expressly and understandably" offer or provide the necessary services. RCW 13.34.180(1)(d). DSHS did that here with its referral to STOP, an approved provider. Nothing in the statute entitles G.W. to require DSHS to pay for equivalent services with his preferred provider. Although DSHS could have referred G.W. to Dr. Robinson for that therapy, doing so would have run afoul of a different DSHS policy. Again, nothing here required that action. This argument is unavailing.

Finally, G.W. argues that the department should have provided therapeutic visitation and family therapy. This argument fails on several grounds. First, it was not a requirement of the disposition order. The duties of DSHS extend to those services ordered by the court rather than services that the parent believes desirable. RCW 13.34.180(1)(d). Second, G.W.'s failure to make use of the existing referrals excused DSHS from considering family therapy. Parental "unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful." *In re Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988). Third, the record here is replete with evidence that forcing additional visitation on the children in

16

light of the repeated inappropriate visitation behavior by the parents was not in the children's best interests. G.W. had to overcome other problems before he was in a position to interact positively with his children. DSHS was not required to indulge in this request where he was already failing to progress at other, more basic services.

Accordingly, we conclude that the record supports the trial court's determination that all necessary services were offered and provided to G.W. The requirements of RCW 13.34.180(1)(d) were satisfied.

*Timely Remediation*

Finally, G.W. argues that the termination was premature because he was making efforts and progressing in remedying his deficiencies as a parent. The trial court correctly applied this statutory factor.

RCW 13.34.180(1)(e) requires that the State prove "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." What constitutes "the foreseeable future" is determined from the child's point of view and depends on the age of the child and the circumstances of the placement. *In re Dependency of A.C.*, 123 Wn. App. 244, 249, 98 P.3d 89 (2004). Here, there was testimony that by the time of trial, the "foreseeable future" had declined to two weeks for J.W. and a month for S.W. RP (Oct. 25, 2013) at 944-945. Both children were in desperate need of permanency. Clerk's Papers at 182.

17

In contrast, G.W. had not even attempted all of his necessary services yet, having declined some and not started others. In particular, he had a severe drug dependency problem that had not been addressed and was anticipated to need one year of treatment. RP (Feb. 18, 2014) at 22. The children did not have that time.

The trial court correctly determined that there was little likelihood G.W.'s parental deficiencies could be remedied in the near future. The evidence amply supported this determination. There was no error.

The order of termination is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.