[No. 34467-6-I.    Division One.    May 28, 1996.]

TAI VINH VO, *Respondent*, v. LE NGOC PHAM, *Defendant*, SUSAN PARTRIDGE, *Appellant*.

*Deborah A. Elvins* and *Stoel Rives Boley Jones & Grey,* for appellant.

*Laurason T. Hunt* and *Law Offices of Laurason T. Hunt,* for respondent.

Cox, J. — Susan Partridge appeals a judgment and decree that quiets title to two properties in her, Tai V. Vo, and Le Ngoc Pham. Partridge's conduct at trial raised significant and unresolved questions as to her mental competency. Accordingly, we vacate the judgment and decree and remand this case to the trial court for a hearing to determine whether she is competent or requires a guardian ad litem.

Vo and Partridge met in 1983. Both are Vietnamese, but speak and read English. Vo worked for the United States Postal Service. He and Partridge maintained an ac-

count at the Seattle Postal Employees Credit Union to which both contributed funds.

In December 1986, Vo and Partridge's sister, Le Ngoc Pham, along with two others not involved in this case, signed a real estate contract to buy a house. Vo testified at trial that Partridge used Pham's name on the contract solely to avoid affecting her welfare status. According to Vo, owning real estate would have jeopardized Partridge's welfare benefits. Vo and Partridge moved into this property and lived there together for several years.

In May 1987, Vo and Partridge (in Pham's name) acquired a second house. They assumed an existing mortgage balance as part of this transaction.

In September 1990, Vo and Partridge stopped living together. On October 24, 1990, Partridge recorded two quit claim deeds purporting to transfer all of Vo's interest in both properties to Pham, Partridge's sister. At trial, Vo denied signing these deeds. On November 5, 1991, Partridge recorded two more quit claim deeds purporting to transfer all of Pham's interest in the two properties to Partridge.

Vo brought a quiet title action against Pham and Partridge. At the bench trial of the case, Vo was represented by counsel. Partridge was not, but she appeared and participated in the trial. Pham did not appear at trial.

During the opening statement of Vo's counsel, Partridge began to exhibit bizarre behavior. Notwithstanding the concerns of the court and Vo's counsel about that behavior, the trial court decided the trial should proceed.

During trial, Partridge's behavior became increasingly bizarre. She manifested extreme vocal outbursts and wild gestures. She also claimed she had two personalities.

At the conclusion of the trial, the court issued its written decision and also entered its findings, conclusions, and a judgment and decree quieting title. The court awarded Vo an undivided 50 percent interest in each of the two properties and awarded the remainder of each property to

Partridge and Pham. Finally, the court retained jurisdiction for further proceedings in this case.

Partridge filed her own notice of appeal. She is now represented by counsel in this appeal.

## I

### Mental Competency

Partridge contends that the trial court erred by failing to appoint a guardian ad litem to represent her interests. We hold that the trial court erred by failing to conduct a hearing to determine whether Partridge was mentally competent or required a guardian ad litem.

In *In re Mignerey*,[1] our Supreme Court stated that "[i]n appointing a guardian, the trial court is called upon to exercise a wide discretion, and the conclusion of the court carries great weight when its action is reviewed before an appellate tribunal." We therefore review a trial court's determination of the need for a guardian ad litem for an abuse of discretion. "A trial court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds."[2]

A trial court has the inherent power to appoint a guardian ad litem for a litigant upon finding that he or she is incompetent. Mental competency is presumed.[3] In *Graham v. Graham*,[4] our Supreme Court stated that

> it is proper and desirable for courts to appoint guardians *ad litem* for parties litigant when reasonably convinced that a party litigant is not competent, understandingly and intelligently, to comprehend the significance of legal proceedings and the effect and relationship of such proceedings in terms

---

[1]11 Wn.2d 42, 49–50, 118 P.2d 440 (1941).

[2]*Woodhead v. Discount Waterbeds, Inc.*, 78 Wn. App. 125, 131, 896 P.2d 66 (1995), *review denied*, 128 Wn.2d 1008 (1996).

[3]*Binder v. Binder*, 50 Wn.2d 142, 148, 309 P.2d 1050 (1957).

[4]40 Wn.2d 64, 66–67, 240 P.2d 564 (1952).

of the best interests of such party litigant . . . . This jurisdiction is part of, and incidental to, the general jurisdiction of a court over a case and the parties properly before it.

The court further noted its concern for the rights of the alleged incompetent: "There is something fundamental in the matter of a litigant being able to use his personal judgment and intelligence in connection with a lawsuit affecting him, and in not having a guardian's judgment and intelligence substituted . . . ."[5]

Notwithstanding the presumption of competency and the fundamental right of a party to use his or her personal judgment and intelligence in connection with his or her lawsuit, the court has a duty to act to protect the rights of a litigant who appears to be incompetent. In *Shelley v. Elfstrom*,[6] this court stated that " '[t]he welfare of incompetent persons and the care of their property are objects of particular care and attention on the part of the courts.' " The *Shelley* trial court had dismissed a suit for damages by a person who had previously been found incompetent. The trial court had opened Shelley's sealed file and learned that he had not been discharged from the hospital "as recovered by either the hospital superintendent or the court," although he had been released.[7] Because RCW 4.08.060 requires that an insane person be represented either by a guardian or a guardian at litem and Shelley had neither, the trial court dismissed his complaint without prejudice.[8]

Reversing that decision, this court held that the prior adjudication had created a *rebuttable* presumption of insanity and that the superior court was thus obligated to

---

[5]40 Wn.2d at 67 (holding that, prior to appointing a guardian ad litem, the trial court must conduct a hearing that affords the alleged incompetent an opportunity to defend and be heard).

[6]13 Wn. App. 887, 889, 538 P.2d 149 (1975) (quoting *In re Mignerey*, 11 Wn.2d at 49; *Potter v. Potter*, 35 Wn.2d 788, 215 P.2d 704 (1950)).

[7]*Shelley*, 13 Wn. App. at 888.

[8]*Shelley*, 13 Wn. App. at 888.

give Shelley an opportunity to defend against the allega-
tion of incompetence.[9] This court therefore held that the
trial court had a duty to determine either that Shelley
was competent or that he required a guardian ad litem.[10]

We have not found any Washington case that addresses
the duty of a trial court to inquire into the competence of
a litigant who has not been legally adjudged insane but
who exhibits the type of bizarre behavior demonstrated by
Partridge. But the cases are clear that the trial court has
the inherent duty and power to make a determination as
to the mental competency of an alleged incompetent by
conducting a hearing, on the record, in which the alleged
incompetent has the opportunity to present evidence on
the question of mental competency.

Here, the trial court was faced with a dilemma. During
the opening remarks of Vo's counsel at trial, Partridge
began to exhibit bizarre behavior. The record shows the
following exchange among counsel for Vo, Partridge, and
the court:

> [Vo's counsel]: Ms. Partridge has basically taken possession
> of the properties, including the one house that was the rental
> house, and has excluded Mr. Vo from any reporting of income
> or any accounting for the houses whatsoever since this —
> these two quit claim deeds.
>
> MS. PARTRIDGE: (Screaming.) Don't lie.
>
> THE COURT: All right.
>
> MS. PARTRIDGE: (Inaudible).
>
> THE COURT: Ms. Partridge —
>
> [Vo's counsel]: I'm not going to — I'm not going to put up
> with this. I'm just not going to do it, Your Honor. I'm not go-
> ing to be scared out of my wits, so I'm just not going to do it.
> There's going to have to [be] either some kind of security in
> here or something.
>
> MS. PARTRIDGE: (Screaming.)

---

[9]*Shelley*, 13 Wn. App. at 889.

[10]*Shelley*, 13 Wn. App. at 889.

THE COURT: What's your position on Ms. Partridge's right to participate in this trial?

[Vo's counsel]: Well, I should have moved for a guardian ad litem, Your Honor. Our position is, is that — you know, she has never filed an answer, at least with us. She has never [served on] us a notice of appearance.

The court expressed its own concern about Partridge's mental competency in the following exchange:

[THE COURT]: I don't know at this point —

MS. [PARTRIDGE]: (Inaudible).

THE COURT: — how I can exclude her from being present or participating. I don't — I gave some thought about whether the Court should initiate appointment of a guardian ad litem. I was concerned that I didn't have sufficient record to make findings that it was necessary — you know, that it was justified. I've done that before on my own motion, but I've also had psychiatric evaluations when I've done it, and I don't have at this time, so —

[Vo's counsel]: All right.

THE COURT: — I don't — I think we're going to have to . . . go forward and do the best we can . . . .

Despite both the court's and counsel's concerns, the trial proceeded.

Partridge's bizarre behavior continued during trial. During her testimony, Partridge stated several times that she had a second personality, a little girl named "Barbara," who controlled Partridge at times. Partridge also claimed to have been treated by a psychotherapist for her alleged multiple personality disorder. "Barbara" seemed to speak several times during the trial. At one point, Susan/ "Barbara" stated to the trial judge that it was the little girl who was speaking. The court then admonished Partridge that it needed to speak with Susan, not "Barbara".

After the presentation of Vo's case, the following exchange occurred among Vo's counsel, the court, and Partridge:

[Vo's Counsel]: Your Honor, I have nothing further.

THE COURT: Okay. All right, Ms. Partridge?

MS. PARTRIDGE: Yes, sir?

THE COURT: Do you want to testify?

MS. PARTRIDGE: What does mean?

THE COURT: Do you want to sit up here and tell me — and offer your exhibits?

MS. PARTRIDGE: Yeah, I like go up there. (Laughter.) My need to talk to Judge. After you Judge and I judge myself, sir, (inaudible) up there. (Screaming.)

THE COURT: Ms. Partridge?

MS. PARTRIDGE: Judge, sir? I sit up here? (Laughter.) Now I sit here, Judge. I like that.

THE COURT: Ms. Partridge?

MS. PARTRIDGE: Yes, sir?

THE COURT: Would you please stand? Raise your right hand. Do you solemnly swear or affirm that the testimony you give in this matter will be the truth?

MS. PARTRIDGE: Yes, sir.

THE COURT: All right. Please be seated.

[Vo's counsel]: Your Honor, could I request that if she's in her Barbara phase that maybe she be sworn in as Barbara also?

THE COURT: No, I don't want to hear Barbara. I want to hear Susan Partridge.

The court was unable to get Susan to speak. "Barbara" spoke at some length regarding Vo's mistreatment of Susan while the court repeatedly asked for Susan to say her name. "Barbara" also threatened to kill Vo. The court then called a recess for nearly two hours and stated that it wanted "to see Susan at 1:30." Thereafter, Partridge's testimony was substantially more lucid. She also testified

in some detail as to the nature of "Barbara's" control over her.

Several other incidents illustrate the need for the trial court to have inquired further into Partridge's mental competence. While Vo was testifying about one of the houses, "Barbara" interrupted, addressing Partridge by name:

Q [Vo's counsel]: Now, before purchasing that house, did you then—I mean before you moved out of that house, did you purchase another house?

A [Vo]: Yes, sir, the one on 15918 First Avenue Northeast.

Q [Vo's counsel]: Okay.

MS. PARTRIDGE: I'm sorry, Susan. I'm sorry I do wrong. He try to steal your house. I'm sorry, I try to help him, but he cheat you. I know. I think —

For a portion of the trial, a sheriff's deputy was present in the courtroom. Although the record does not directly answer why the deputy was present, an exchange between counsel for Vo and the court suggests they were concerned that Partridge might further disrupt the trial.[11]

At the conclusion of the trial, the court entered its findings of fact and conclusions of law. A portion of finding 2, which is unchallenged on appeal, states:

At times during the trial, the Defendant Partridge spoke rationally and intelligently, understanding the significance of the proceedings and at other times, she was subject to extreme vocal outbursts and wild gestures. She represented herself in these proceedings but was not qualified to do so.

We conclude from our review of the record that the above unchallenged finding describing Partridge's conduct during trial is supported by the record. But the finding

---

[11]"[Vo's counsel]: Excuse me. I'm not pleased about proceeding under the situation as [it] exists right now, Your Honor. As you can see, the Sheriff's deputy has left, and —

"THE COURT: That's all right. We'll get him back if we need him."

also illustrates the need for a hearing on her mental competency that the trial court never conducted.

■ *Graham* teaches that the court should appoint a guardian ad litem for a litigant when it is "reasonably convinced that a party litigant is not competent, understandingly and intelligently, to comprehend the significance of legal proceedings and the effect and relationship of such proceedings in terms of the best interests of such party litigant."[12] When, as here, the court's own finding suggests that Partridge did not understand the significance of the proceedings throughout the trial, a hearing on the question of mental competency is required.

Vo concedes that the principle of *Graham* applies to this case. Nevertheless, he argues that the trial court fulfilled its duty and properly exercised its discretion. We disagree.

Vo notes that the court inquired of Vo's counsel at the beginning of trial as to Partridge's ability to participate at trial. The court also examined the court file and reviewed the letter that constituted Partridge's notice of appearance. Vo concludes that the trial court properly exercised its discretion and determined that Partridge met the *Graham* test—that she could understand the proceedings and properly defend her interests. Vo further states that the trial court made efforts throughout the trial to assure that Susan, and not "Barbara," was present and participated in all stages of the trial. In doing so, the trial court endured Partridge's outbursts and instructed her that Susan's, and not "Barbara's," presence was required.

However, as noted above, *Graham* contemplates mental competency for the *entire* proceeding. We lack a sufficient record to determine that the trial court satisfied that test. Even assuming that the court properly determined that Partridge was competent at the time of her outburst during Vo's opening statement, her subsequent conduct was sufficiently bizarre to warrant renewed inquiry.

---

[12] 40 Wn.2d at 66–67.

Vo also argues that the fact that Partridge forged Vo's name on the deeds and thereafter executed deeds to vest title in herself showed a degree of competency that satisfies the *Graham* test. The problem with that argument is that such actions *prior* to trial do not answer the more basic question whether she was competent *at* trial.

In holding as we do, we do not suggest what the outcome of the hearing on competency should be. The parties will have an opportunity to present proper evidence at a hearing on the question of competency and have that matter resolved by the trial court in the proper exercise of its discretion.

We vacate the judgment and decree and remand this case to the trial court for further proceedings consistent with this opinion.

The rest of this opinion has no precedential value and therefore will not be published.[13]

KENNEDY, A.C.J., and ELLINGTON, J., concur.