
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 77698-3-I |
| | ) | |
| M.P., DOB: 11/11/08, | ) | DIVISION ONE |
| | ) | |
| Minor Child. | ) | |
| | ) | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF SOCIAL AND | ) | |
| HEALTH SERVICES, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| L.B., | ) | |
| | ) | |
| Appellant. | ) | FILED: September 24, 2018 |
| | ) | |

LEACH, J. — L.B. raises multiple issues in this appeal of the termination of her parental rights to her son, M.P. L.B. claims that her mental illness required the court, on its own initiative, to hold a competency hearing or appoint a guardian ad litem (GAL), her counsel was ineffective for failing to request this relief, an evidentiary ruling violated her right to present a defense, the termination statutes are unconstitutional as applied to this case, and procedural due process required the Department of Social and Health Services (Department) to include in the trial record its guardianship agreement with M.P.'s father. We affirm.

## FACTS

L.B. is the mother of M.P., born in November 2008. M.P.'s father is P.P. L.B. has a second child by a different father. That child was placed in protective custody in 2005 and has remained in his father's care since that time.

In 2010, the Department filed agreed orders declaring M.P. dependent as to both L.B. and P.P. L.B.'s agreed order stated she recently exhibited mental health issues and unsafe parenting during an emergency room visit with M.P. She had been hospitalized in 2009 for mental health issues, and the parents had a history of conflict, including an incident where the father pushed L.B. while she was holding M.P. The order also alleged, and L.B. denied, that she "has a pattern of asking relatives to take care of [M.P.] for short periods and then disappearing for days or weeks." On two occasions, the father informed the Department that L.B. was using methamphetamine.

During the dependencies, Dr. Joanne Solchany diagnosed L.B. with schizophrenia. She recommended weekly counseling and medication. Dr. Solchany concluded that L.B.'s prognosis was poor and that her condition would likely worsen over time.

In 2011, the Department filed a petition to terminate both parents' parental rights. The petition alleged that L.B. was "non-compliant with medication management." The petition acknowledged L.B.'s partial compliance with some services but still requested termination.

In April 2012, the Department substituted a guardianship petition for the termination petition. After a hearing, the court appointed M.P.'s aunt, K.K., as his GAL and dismissed the dependencies. The parents appealed, challenging the court's discovery sanctions and arguing that the court misinterpreted the guardianship statute.

In December 2014, this court reversed the guardianship order and remanded for reinstatement of the dependencies and a new trial.[1]

In August 2015, after seven months of additional dependency services and L.B.'s discharge from a mental health program, the superior court suspended her visits with M.P. until she received treatment and stabilized her behavior. The court dismissed the guardianship petition and changed the primary permanency plan to adoption.

Several months later, psychologist Dr. Gary Wieder evaluated L.B. He diagnosed her with paranoid schizophrenia. His report stated she was "uniformly unintelligible in her responses to even simple questions." Her presentation "suggested severe impairment," "severely compromised functioning," "and no awareness or insight into her limitations." Her mental status exam was in the normal range and indicated no cognitive impairment.

In January 2016, L.B. admitted during a dependency review that she had not engaged in mental health services for several years.

In April 2016, L.B. filed a handwritten declaration stating, "I don't agree with this government stealing my child" and "my child and belongings were stolen at the hospital." The declaration listed the services she had attended or completed and what she would

---

[1] In re Dependency of M.P., 185 Wn. App. 108, 340 P.3d 908 (2014).

provide for M.P. if the court returned him to her care. The declaration indicated she was taking a medication prescribed by a counseling service.

In December 2016, the court ordered L.B. "to be evaluated for medication by a psychiatrist, and once prescribed medication she shall remain complian[t] with all treatment recommendation[s] made by . . . that provider."

In February 2017, the Department filed a petition to terminate both parents' parental rights. The petition stated that despite numerous services over a lengthy period of time, the parents had made little progress in correcting their parental deficiencies. It stated that L.B. "still is not engaged in mental health therapy or taking recommended medication." The petition alleged that L.B. "is unable to parent the child because of mental illness that continues to go untreated."

In May 2017, L.B. asked for a continuance to review a proposed guardianship agreement between the Department and the father. Her request stated that

> [t]he father and Department have conditionally settled his case. The Department and father agree that the conditional settlement only goes into effect if and when the mother's parental rights are terminated or the mother otherwise agrees to permanent placement of the child outside her home (i.e. relinquishment or guardianship) by signing all necessary court documents to enforce such an agreement.

That same month, Sound Mental Health discharged L.B. from its program due to her failure to engage in treatment. The court later changed the primary permanency plan from adoption to guardianship "for the father and possibly for the mother."

In October 2017, the termination trial started. L.B. did not appear until the third day of trial.

Anne Sacquitne, the social worker assigned to M.P.'s dependency, testified that L.B.'s mental health and participation in services generally deteriorated after this court's reinstatement of the dependencies in late 2014. During a visit with M.P. in 2015, L.B. "was extremely psychotic and delusional" and "screaming and yelling" that M.P. had been stolen from her. Sacquitne conceded, however, that she had not spoken with L.B. for two and one-half years. When asked about recent interactions with L.B., Sacquitne stated, "Either she won't speak to me when I see her at court or she'll scream. And she'll be walking around pacing, she'll be rustling paper, she'll be writing things, very distracted look."

Sacquitne testified that L.B. participated in some services, including services offered after reinstatement of the dependencies. She also said that, at times, L.B. "was able to listen and want[ed] to do things to help her get [M.P.] back." But L.B. had not made "any substantial efforts to participate in services for mental health." Sacquitne noted that L.B. made it clear that she "didn't want [M.P.] to be with relatives."

Sacquitne concluded that M.P. "needs his mother's rights terminated . . . so he can have a stable life where he doesn't have to worry that somebody's coming to see him. And he doesn't have to worry about seeing her and being afraid that . . . she'll threaten to kill his cousins or lock him in a room."

Diana Farrow, M.P.'s court-appointed special advocate (CASA), testified that M.P. wanted to stay with his aunt and did not want contact with his mother:

> He is very clear that he wants to stay where he is. *He says he . . . doesn't want to have visits. He doesn't want to see his mother, and she scares*

*him. . . . He's told me that over and over again, that he doesn't want to see her. He wants the dependency to be over.* He is very adamant that he doesn't want me to keep coming around.

(Emphasis added.) Farrow echoed Sacquitne's opinion that L.B.'s mental health and participation generally worsened after reinstatement of the dependencies. But, like Sacquitne, Farrow had minimal contact with L.B. after reinstatement and based her opinion primarily on what she observed in court hearings. Farrow described L.B.'s demeanor at those hearings as agitated and angry. She recalled L.B. yelling about the Department stealing M.P. from her.

When asked whether she saw indications "during the last couple of years" that L.B. understood her need for medication, Farrow said, "[S]he definitely understood that she was supposed to get on medication in order to have visits resume. She knew that that was a part of what she was required to do and that that was important to be able to see [M.P.]." Farrow also testified that L.B. had not participated in mental health treatment since 2015. Farrow recommended termination, stating that M.P. needs certainty and relief from the anxiety and stress he feels.

Laura Mueser, an evaluator with the Foster Care Assessment Program, testified that when she mentioned L.B. to M.P., "[H]e visibly startled and . . . expressed fear of her." Mueser found justification for M.P.'s reaction in the dependency records:

[I]n reviewing the records, I had seen quite a number of occasions on which [L.B.'s] behavior had been pretty erratic or unpredictable, and . . . in a way that was highly visible to [M.P.]. . . . [S]aying hurtful or bizarre things to him, or showing up at the home unannounced, and those sorts of things, so that . . . even without living with her, the influence that she was having over [him] was striking.

-6-

Mueser recommended termination "to get resolution about [M.P.'s] permanency" without "the more erratic input from his mother."

Psychologist Gary Wieder testified about his 2015 psychological evaluation of L.B. He described her as "almost unintelligible, impossible to understand. Her behavior was bizarre." She reported auditory hallucinations, including a voice that wasn't hers, and a paranoid delusion that somebody had kidnapped her child. Her testing indicated "gross impairment" and a "high degree of disability." Dr. Wieder concluded she suffered from schizophrenia and had a "very poor" prognosis. He thought reunification with M.P. "would be dangerous" because "[i]ndividuals with that level of impairment are unable to take care of themselves in the simplest of ways, let alone take care of a child."

In closing arguments, the Department and CASA asked the court to terminate L.B.'s parental rights. The Department's counsel conceded that L.B. "actually did a lot of the services" but argued that her failure to follow through with mental health treatment required termination. The CASA noted M.P.'s fear of L.B. and his statement "that he does not want to visit her."

L.B.'s counsel argued the Department did not provide all necessary services and made inadequate efforts to assist L.B., particularly with respect to mental health services and medications. Counsel further argued that L.B.'s belief that the Department stole her child was "not delusional; that actually comports with what's gone on in this case, which is that the Department withholds services from [L.B.], but also withholds her child."

The court terminated L.B.'s parental rights and entered the following pertinent findings of fact:

2.14 The mother understood the services that she needed to do to correct her parental deficiencies as demonstrated by mother's participation in services. The mother went to Sound Mental Health for services multiple times from 2012 through 2017, when she was discharged . . . for not consistently engaging in services or complying with program treatment expectations.

2.15 The mother was given a psychiatric medication prescription on February 23, 2017 during a telehealth appointment with Adult Community Support.

2.16 The mother filed several declarations in the court file for this matter indicating her knowledge of and participation in referred services.

2.17 The mother clearly understood the necessity for her to participate in those services prior to reinstating visitation with her son, as the CASA testified the mother told her she needed to go to Sound Mental Health so she could visit with [M.P.].

2.18 The CASA was present in a meeting where the mother stated openly that she needed to engage in mental health services and to take medication.

2.19 There is little likelihood that conditions will be remedied so that the child can be returned to [his] mother within the near future. Mother suffers from schizophrenia and has been actively psychotic . . . during significant periods of time from the inception of this dependency on. *Without medication, her illness leaves mother effectively unable to engage with [M.P.] on any level.* There is evidence that prior to the Guardianship trial in 2012, mother was taking prescribed medication for an isolated period of time. She is so substantially impaired by her illness that she is unable to function and is unable to safely parent. *Although the prognosis for any patient with schizophrenia is poor, when coupled with the length of her illness as well as her lack or engagement with medication management, [L.B.'s] prognosis is worse.* The mother is unable to benefit from any kind of traditional therapy until such a time that her symptoms are resolved by medication. Once an effective medication protocol was established, mother would then need to stay on the medication and engage in traditional therapy before she was able to make any progress towards her ability successfully to function. Given that over the last seven years mother has been unable

to take the steps necessary to effectively and consistently address her symptoms with medication, there is little likelihood that she will be able to do this in the near, *or distant* future. As a result, there is little likelihood that [M.P.] could be returned to her care in the near future.

2.20 The CASA has spent hundreds of hours on the case since assigned to the original dependency in 2011 and again on March 17, 2015. She has visited with [M.P.] thirty-seven (37) times and has observed him at visits with the mother. She has spoken with the mother at court hearings and in meetings. *[M.P.] has been open in expressing fear and anxiety to the CASA about contact with his mother. He was observed to be frightened when the mother appeared at the DSHS office during two visits which [she] was not allowed to attend. He has stated to the CASA that he does not wish to have visits with his mother. He has expressed his desire for the dependency to end and he does not want to continue having home visits with the CASA and social worker.*

2.23 Continuation of the parent-child relationship . . . clearly diminishes the child's prospects for early integration into a stable and permanent home. [M.P.] is a difficult child and the strain of not having permanence affects his behavior. His caregivers love him and provide for him, but are not able to treat him as their own because he isn't. Because of the requirements of the dependency, decisions about [M.P.'s] care are not made by them. *[M.P.] knows this and is anxious about his lack of permanence. His behavior is tied to his anxiety about his uncertainty about his future. [M.P.] needs day to day consistency and clarity of his daily routine. It is important that [M.P.] feels like he fits in with his permanent family and as he enters puberty, the more aware he will be of the difference between himself and other children. The only way that the child can achieve the certainty that he deserves is by terminating his mother's parental rights.*

. . . .

2.26 The child's mother is unfit to parent this child. Her untreated mental illness makes her unable to safely care for any child and she is currently unfit to parent [M.P.].

2.27 Termination of the parent-child relationship between the child and the mother is in the child's best interest. *The second dependency has been hard on [M.P.] since he knows that currently he does not have permanence. CASA supports termination of parental rights to achieve permanence for [M.P.].*

(Emphasis added.)

L.B. appeals.

## STANDARD OF REVIEW

Parental rights are a fundamental liberty interest protected by the United States Constitution.[2] To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:[3]

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . . and
> (f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[4]

If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child.[5]

---

[2] Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).
[3] RCW 13.34.190(1)(a)(i).
[4] RCW 13.34.180(1).
[5] RCW 13.34.190(1).

On review, unchallenged findings of fact are considered verities.[6] With one exception, L.B. does not challenge the court's findings of fact.[7]

## ANALYSIS

### Guardian Ad Litem / RCW 4.08.060 / Due Process

L.B. first contends the trial court violated statutory and due process protections because it did not, on its own initiative, either appoint a GAL or hold a competency hearing. She contends that RCW 4.08.060 and related authorities require a GAL or a competency hearing "[w]henever there is reason . . . to question a party's mental competence." She contends the evidence at trial raised questions about her competence. Thus, the court's failure to appoint a GAL or hold a hearing violated RCW 4.08.060 and denied her due process. We disagree.

In general, a litigant in a civil proceeding is competent if he or she can "comprehend the significance of [the] legal proceedings and the effect and relationship of such proceedings in terms of the best interests of [the] litigant."[8] A court presumes that a litigant is competent.[9] Absent a finding to the contrary, the litigant has a "fundamental right . . . to use his or her personal judgment and intelligence in connection with his or her lawsuit."[10] If, however, a litigant "appears to be incompetent" or applies for a GAL under RCW 4.08.060, courts have "a duty" to protect the litigant's rights by holding a

---

[6] In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).
[7] L.B. assigns error only to the court's finding that "[t]he only way that the child can achieve the certainty that he deserves is by terminating his mother's parental rights."
[8] Graham v. Graham, 40 Wn.2d 64, 66-67, 240 P.2d 564 (1952).
[9] Vo v. Pham, 81 Wn. App. 781, 784, 916 P.2d 462 (1996).
[10] Vo, 81 Wn. App. at 784-85.

competency hearing or appointing a GAL.[11] The court must take such action on its own initiative if the litigant's conduct at trial and/or other evidence indicate the litigant does not comprehend the significance of the proceedings.[12] Whether to appoint a GAL or hold a hearing is entrusted to the sound discretion of the trial court.[13] The court did not abuse its discretion in this case.[14]

Before trial, L.B.'s counsel submitted a memorandum in which she expressly vouched for L.B.'s competency:

> [L.B.] can articulate that she feels that her child has been stolen and that [M.P.] should be returned to his natural home. *[L.B.] indicates from her words and actions that she understands the nature of the dependency and termination proceedings. Mother meets the standard of competency for a civil case.* Graham v. Graham, 40 Wn.2d 62 [, 240 P.2d 564] (1952).

(Emphasis added.) The trial court was entitled to give counsel's opinion of her client's competency "considerable weight."[15] Counsel had represented L.B. for several years and attended numerous review hearings with her during the dependency proceedings.

---

[11] Vo, 81 Wn. App. at 785-86; RCW 4.08.060 (providing, in part, that "[w]hen an incapacitated person is a party to an action in the superior courts he or she shall appear by guardian, or if he or she has no guardian, . . . the court shall appoint one to act as guardian ad litem").

[12] See Vo, 81 Wn. App. at 786-90 (litigant's bizarre courtroom behavior called her competence into question and required the court to hold a competency hearing); Graham, 40 Wn.2d at 66-67 (courts can appoint a GAL for litigants sua sponte "when reasonably convinced that [the] litigant is not competent, understandingly and intelligently, to comprehend the significance of legal proceedings and the effect and relationship of such proceedings in terms of the best interests of such party litigant").

[13] Vo, 81 Wn. App. at 784.

[14] The State contends review is precluded because L.B. invited any error when her counsel told the court she met the criteria for competency. We need not decide whether the invited error doctrine applies here because we conclude the court did not abuse its discretion.

[15] See State v. Lord, 117 Wn.2d 829, 901, 822 P.2d 177 (1991) (criminal case).

Significantly, neither the Department nor the CASA challenged counsel's assessment, which was corroborated by L.B.'s unremarkable behavior at trial.[16]

In addition, the court heard evidence indicating that L.B. understood what was happening in the dependency and termination proceedings. The CASA testified that during the past several years, L.B. "definitely understood that she was supposed to get on medication in order to have visits resume. She knew that that was a part of what she was required to do and that that was important to be able to see [M.P.]." Similarly, social worker Sacquitne thought L.B. "understood what I was telling [her]." L.B.'s completion of some services also demonstrated her understanding of the proceedings and her role in them.

L.B. argues, however, that the trial testimony of Dr. Wieder, social worker Sacquitne, and the CASA raised doubts about her competency. But, unlike L.B.'s counsel, none of those witnesses addressed L.B.'s *current* competency or the litigant competency criteria in Graham. And while the witnesses described L.B.'s schizophrenia symptoms, none of them had any significant recent interaction with L.B.

For similar reasons, allegations in the termination petition about L.B.'s schizophrenia provide little support for L.B.'s position. The State largely based those allegations on the six-year-old psychological evaluation by Dr. Solchany and the 2015

---

[16] The litigant in Vo exhibited extremely "bizarre behavior" at trial, including screaming and presenting herself through multiple personalities. Vo, 81 Wn. App. at 786. One of the personalities threatened to kill Vo. The trial court found that the litigant, while sometimes appearing to understand the significance of the proceedings, "'was subject to extreme vocal outbursts and wild gestures.'" Vo, 81 Wn. App. at 786-89.

evaluation by Dr. Wieder. None of the allegations addressed L.B.'s competency *for purposes of trial* or <u>Graham</u>'s competency criteria.[17]

Considering the presumption of competence, counsel's assessment of L.B.'s competence, her conduct at trial, the weight the court was entitled to give counsel's assessment, and the absence of any evidence either directly rebutting counsel's assessment or addressing the relevant competency criteria, we cannot say the court abused its discretion in failing to hold a competency hearing or appoint a GAL on its own initiative.

<u>Guardian Ad Litem / Ineffective Assistance of Counsel</u>

L.B. next contends her counsel was ineffective because she did not request a competency hearing or a GAL. Again, we disagree.

Parents have a statutory and constitutional right to representation by counsel in termination proceedings.[18] To prevail on a claim of ineffective assistance of counsel, L.B. must show (1) deficient performance and (2) resulting prejudice.[19] The first prong "requires a showing that counsel's representation fell below an objective standard of reasonableness based on consideration of all of the circumstances."[20] The second prong

---

[17] We note our courts have recognized that a person diagnosed with schizophrenia may nevertheless be competent to stand trial. <u>State v. Harris</u>, 114 Wn.2d 419, 429, 789 P.2d 60 (1990) (noting that criminal cases in "[s]tate and federal courts have also upheld findings of competency despite the defendant's diagnosed schizophrenia").

[18] RCW 13.34.090(2); <u>In re Dependency of V.R.R.</u>, 134 Wn. App. 573, 581, 141 P.3d 85 (2006); <u>In re Welfare of J.M.</u>, 130 Wn. App. 912, 921, 125 P.3d 245 (2005).

[19] <u>In re Dependency of S.M.H.</u>, 128 Wn. App. 45, 61, 115 P.3d 990 (2005); <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[20] <u>State v. Thomas</u>, 109 Wn.2d 222, 226, 743 P.2d 816 (1987).

requires a showing of a "reasonable probability" that, but for counsel's errors, the result of the proceeding would have been different.[21] To carry her burden, L.B. must overcome a strong presumption of effective representation and demonstrate the absence in the record of any legitimate or tactical basis for counsel's conduct.[22] L.B. has not carried her burden.

L.B. maintains that while her counsel may have reasonably believed she was competent before trial, it was objectively unreasonable not to request a competency hearing once counsel heard the testimony of the Department's witnesses. At that point, she contends, "[C]ounsel had ample information raising serious doubt as to L.B.'s capacity as a party litigant, her ability to understand the proceedings in terms of her best interests, and her ability to weigh the potential outcomes when providing directive to counsel." This contention fails for several reasons.

First, it involves matters outside the record. Because L.B. did not raise this issue below, the record contains nothing about her interactions with counsel before or during trial. Nor does it contain any declarations or other evidence concerning counsel's reasons for concluding L.B. met the competency criteria in Graham. The absence of this information in the record precludes appellate review.[23]

---

[21] State v. Carter, 56 Wn. App. 217, 218 n.1, 783 P.2d 589 (1989).
[22] State v. Hamilton, 179 Wn. App. 870, 879-80, 320 P.3d 142 (2014).
[23] See State v. Linville, No. 94813-5, slip op. at 12 (Wash. Aug. 16, 2018), http://www/courts/wa/gov/opinions/pdf/94813-5.pdf ("We cannot tell from this record why counsel did not object; for that reason we cannot decide whether trial counsel's performance was deficient.").

-15-

Second, the record provided contains no basis for concluding that counsel's performance was deficient. As discussed above, the Department's witnesses did not address L.B.'s competence for trial and had little contact with her in recent years. L.B. has not overcome the strong presumption that counsel provided effective representation.

And third, there is no reasonable probability that the outcome of the proceedings would have been different had the court appointed a GAL for L.B. While a GAL might have considered pursuing a guardianship involving L.B. and M.P., L.B. expressly opposed a guardianship, and a GAL arguably could not have pursued that alternative without L.B.'s approval.[24] Nothing in the record supports a reasonable probability that L.B. would have given such approval. Nor does the record support a reasonable probability that the potential guardian—M.P.'s aunt—would have agreed to a guardianship that included L.B. The CASA testified that the aunt had become "less optimistic about her ability to manage her relationship with [L.B.] in a way that's healthy for her family" and now favored termination. It is thus unlikely the aunt would have agreed to a guardianship absent termination of L.B.'s parental rights.[25]

Finally, there is no reasonable probability that the court would have concluded that a guardianship was in M.P.'s best interest had a GAL recommended that alternative. The court found that M.P. demonstrated fear of L.B. at several visits, has "fear and anxiety"

---

[24] See In re Marriage of Lane, 188 Wn. App. 597, 603-04, 354 P.3d 27 (2015) (GAL cannot waive the substantial rights of an incapacitated person without their approval); In re Welfare of H.Q., 182 Wn. App. 541, 554-56, 330 P.3d 195 (2014) (attorneys and GALs cannot waive litigant's substantial rights without authorization).

[25] To establish a guardianship, all parties must "agree to entry of the guardianship order." RCW 13.36.040(2)(b).

about contact with her, "is anxious about his lack of permanence," and exhibits behavior that "is tied to his anxiety about his uncertainty about his future." M.P. "does not wish to have visits with his mother" and wants the dependency and visits to end. The court also found that L.B.'s prognosis was extremely poor and that there was little likelihood she could make progress in the near or *distant* future. The court determined that "[t]he only way that the child can achieve the certainty that he deserves is by terminating his mother's parental rights" and that "[t]ermination of the parent-child relationship . . . is in the child's best interest."

While a guardianship could have prohibited L.B.'s visitation until her condition improved, the court's findings indicate that termination was in M.P.'s best interest regardless of whether a guardianship with restricted visitation was available.

Exclusion of Evidence / Due Process

L.B. next challenges an evidentiary ruling about the guardianship arrangement with M.P.'s father. During the CASA's testimony, L.B.'s counsel asked if it was her "understanding that [the father] has signed guardianship [documents]." The Department's counsel objected on relevance grounds. The following exchange then occurred:

> THE COURT: . . . . . I was asking [L.B.'s counsel] what's the relevance.
>
> [L.B.'S COUNSEL]: Well, . . . I think it's relevant that this CASA favors one resolution for the mother and a different resolution for the father.
>
> THE COURT: I'll sustain the objection. Ask another question.

For the first time on appeal, L.B. claims, "The fact that the Department had already agreed with [the father] to place M.P. in a guardianship . . . was relevant to L.B. disproving RCW

-17-

13.34.180(1)(f)." She maintains that "evidence of the fact that M.P. was ultimately going to achieve permanency through a guardianship was indeed relevant to the question of whether L.B.'s continued legal relationship with M.P. diminished his prospects for integration." The court's ruling, she argues, violated her due process right to present a defense.

We generally do not review claims raised for the first time on appeal absent a showing of manifest error affecting a constitutional right.[26] A constitutional error is "manifest" only if the error results in "practical and identifiable consequences in the trial."[27] The alleged error must have actually prejudiced the defendant's rights at trial.[28]

Even if we assume that the court's evidentiary ruling was wrong,[29] L.B. does not show that the error actually prejudiced her constitutional rights. The court sustained the Department's objection to the testimony because it found counsel's relevancy argument unpersuasive. But it did not preclude the admission of all evidence relating to the proposed guardianship. On the contrary, exhibits,[30] testimony,[31] and court filings, including a stipulated order and trial brief, demonstrated that the plan for M.P. was a guardianship with his aunt, and that the Department and M.P.'s father had reached an

---

[26] RAP 2.5(a).

[27] State v. Lamar, 180 Wn.2d 576, 583, 327 P.3d 46 (2014).

[28] State v. Kirkman, 159 Wn.2d 918, 934-35, 155 P.3d 125 (2007).

[29] See In re Welfare of R.H., 176 Wn. App. 419, 428-29, 309 P.3d 620 (2013) ("[T]he availability of a guardianship is evidence that the trial court should consider when determining whether the State has met its burden to prove RCW 13.34.180(1)(f).").

[30] A June 2017 permanency planning order stated that the primary plan was for a guardianship with M.P.'s father.

[31] Social worker Sacquitne testified that the permanent plan for M.P. was guardianship or adoption with his aunt.

-18-

agreement in principle for that guardianship. Thus, any error was not manifest because the court admitted evidence of the guardianship.[32]

This alleged error is also not manifest because L.B. opposed a guardianship, a guardianship option was not properly before the court, and a guardianship was at odds with the court's findings. L.B.'s counsel told the court, "The direction from mother to mother's counsel includes that the mother does not want [the maternal aunt] to raise her son." Consistent with that directive, L.B.'s counsel did not file a guardianship petition or argue for an alternative to termination. Consequently, a guardianship alternative involving L.B. was not before the court.[33] In such circumstances, the trial court's focus is narrow:

> [W]hen faced solely with a petition for termination of parental rights, the court's inquiry is whether the allegations in RCW 13.34.180 are proved by clear, cogent and convincing evidence, and whether termination is in the best interest of the child. RCW 13.34.190. If the allegations in RCW 13.34.180 are proved by clear, cogent, and convincing evidence, termination is authorized by statute.[34]

In addition, "proof of the allegation in [former] RCW 13.34.180(6) [1998] [i.e., "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home"] establishes that continuation of the parent-child relationship will harm the child, and in such circumstances a guardianship under RCW 13.34.231 and .232 . . . would not be an appropriate alternative to

---

[32] Because evidence of the guardianship agreement was before the court, L.B.'s related claim that the absence of such evidence violated procedural due process is meritless.

[33] In re Dependency of K.S.C., 137 Wn.2d 918, 932, 976 P.2d 113 (1999) ("The State petitioned for termination of parental rights, and no party petitioned for a dependency guardianship. A guardianship was not before the trial court.").

[34] K.S.C., 137 Wn. 2d at 930 (emphasis added).

*termination.*"[35] Similarly, proof of all six statutory prerequisites to termination "'necessarily demonstrates that termination . . . is required to prevent harm or risk of harm to the child."[36]

Here, the trial court found all six statutory prerequisites to termination. And, as previously noted, it found that M.P. expressed fear and anxiety about L.B. and his future, wanted no contact with her, and needed certainty. The court also found there was little likelihood L.B. could make progress in the near or even *distant* future. These findings demonstrate that L.B.'s relationship with M.P. is harmful to him and that a guardianship would negatively impact his integration into a stable and permanent home.[37]

Any error in sustaining the Department's objection to additional evidence of the guardianship was not manifest error.

### Constitutionality of Termination Statutes as Applied

For the first time on appeal, L.B. contends the termination statutes are unconstitutional as applied to her case. She fails, however, to carry her burden of demonstrating manifest constitutional error and the unconstitutionality of the statutes beyond a reasonable doubt.

---

[35] K.S.C., 137 Wn.2d at 930 (emphasis added); see also In re Dependency of M.-A.F.-S., __ Wn. App. 2d __ , 421 P.3d 482, 497 (2018), petition for review filed, No. 96150-6 (Wash. Aug. 3, 2018).

[36] M.-A.F-.S., 421 P.3d at 496 (quoting In re Welfare of C.B., 134 Wn. App. 336, 344, 139 P.3d 1119 (2006)).

[37] L.B. points out that RCW 13.34.180(1)(f) "is mainly concerned with the continued effect of the *legal relationship* between parent and child, as an obstacle to adoption" or some other permanency plan. In re Dependency of A.C., 123 Wn. App. 244, 250, 98 P.3d 89 (2004). But while RCW 13.34.180(1)(f) is "mainly" focused on that effect, "a detrimental personal relationship [is] not irrelevant." A.C., 123 Wn. App. at 250.

We presume statutes are constitutional.[38] The challenging party has the heavy burden of proving otherwise beyond a reasonable doubt.[39] A party challenging the constitutionality of a statute *as applied* must show "that application of the statute in the specific context of the party's actions or intended actions is unconstitutional."[40] L.B. argues that termination of her fundamental right to parent was unconstitutional because M.P. had achieved permanency through a guardianship, adoption was not foreseeable, and termination was therefore unnecessary to achieve the State's interest under the statutes.

This argument rests on the assumption that a guardianship had either been established or was certain to occur. But the guardianship agreement was tentative, had not been filed with the court, and only involved the father and M.P. Furthermore, the potential guardian opposed L.B.'s participation in the guardianship and favored termination of her parental rights. So a real possibility existed that the tentative agreement would unravel if L.B.'s parental rights were not terminated.

Also, the court found that termination was necessary to avoid harm to M.P. As discussed above, the court found that M.P. experienced anxiety at the mere mention of L.B. and wanted no contact with her. Our courts have repeatedly rejected constitutional challenges to the termination statutes—including challenges based on the potential availability of less restrictive alternatives to termination—on the ground that the statutes

---

[38] In re Dependency of C.B., 79 Wn. App. 686, 689, 904 P.2d 1171 (1995).
[39] C.B., 79 Wn. App. at 689.
[40] City of Redmond v. Moore, 151 Wn. 2d 664, 668-69, 91 P.3d 875 (2004).

are primarily concerned with preventing harm or the risk of harm to the child.[41]  While prior cases involved facial challenges to the statutes, they support the proposition that a demonstrated risk of harm from the parent/child relationship is sufficient to thwart a constitutional challenge to the termination statutes.[42]  The record in this case amply demonstrates a risk of harm to M.P.

L.B. argues, however, that "[a] guardianship could easily be shaped to provide a sense of security and stability by strictly forbidding contact between L.B. and M.P. until she healed her own problems and the guardian and M.P. agreed to it.  RCW 13.36.050."  She contends this fact undermines the court's finding that termination was necessary to achieve certainty for M.P. and supports her claim that the termination statutes are unconstitutional as applied here.

But again, this contention rests on the uncertain proposition that a guardianship involving L.B. would have come to fruition.  And even if a guardianship with the restrictions proposed by L.B. were a certainty, the availability of that option would not undermine the challenged finding or demonstrate either manifest error or the unconstitutionality of the statutes as applied.  The court found that M.P. is frightened by L.B., their relationship causes him anxiety about his future, this anxiety negatively affects his behavior, and he wants visitation and the dependency to end.  L.B. also made little progress with her mental health in seven years, and there is little likelihood she could become a fit parent even in the *distant* future.  In addition, a guardianship involving L.B. would require dismissal of

---

[41] M.-A.F.-S., 421 P.3d at 496 (citing cases).
[42] M.-A.F.-S., 421 P.3d at 496.

the dependency and discontinuation of L.B.'s services.[43] Without services, L.B.'s prospects for improving her parental deficiencies and obtaining visitation would be virtually nonexistent.

In conclusion, even assuming a guardianship was available and could protect M.P. from contact with L.B., the court's finding that termination was necessary to achieve certainty and permanency for M.P. was neither *manifest* constitutional error nor an unconstitutional application of the termination statutes *beyond a reasonable doubt.*[44]

Affirmed.

_Leach, J._

WE CONCUR:

_Dwyer, J._                              _Appelwick, C.J._

---

[43] In re Welfare of A.W., 182 Wn.2d 689, 700, 344 P.3d 1186 (2015); RCW 13.36.010, .050(5).

[44] See M.-A.F.-S., 421 P.3d at 498 (rejecting argument that termination was inappropriate where ongoing dependency could protect child by prohibiting contact with parent until parent "had healed her own problems."); cf. In re Esgate, 99 Wn.2d 210, 214-25, 660 P.2d 758 (1983) (termination upheld where "the State established that continuation of the parent/child relationship often created feelings of insecurity and instability in the child").