IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Guardianship of:<br><br>R.C.,<br><br>        a Minor Child. | No. 85974-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DíAZ, J. — The superior court granted a full guardianship over R.C. The father of R.C. argues that the trial court erred by neither appointing a litigation guardian ad litem (GAL) for him nor holding a hearing on whether to appoint one; that his counsel was ineffective for not renewing an earlier motion to appoint a litigation GAL; and that the trial court erred by prohibiting visitation between him and R.C. Because the father fails to establish reversible error, we affirm.

## I.        BACKGROUND

In February 2022, Cassondra Arambula and her spouse, Cheyne Young, petitioned the court to be appointed guardians for R.C. They alleged that the father—who at the time lived across the street from them—was not able or willing to care for R.C., had left her unattended on multiple occasions, clearly suffered from a mental impairment, and had people staying at his house doing drugs. Later, Celestine Collins, who identified herself as R.C.'s godmother, also filed a guardianship petition.

The court appointed Lindsay Appleton as GAL for R.C. Appleton later

testified that R.C. was born in California, and her mother had been "out of the picture" since she "gave" R.C. to Collins when R.C. was an infant. Some time before R.C. turned two, the father took R.C. from Collins, who subsequently relocated from California to Washington. When R.C. was approximately three, the father asked Collins to come back to California to get R.C., which Collins did, and she brought R.C. to Washington with her. The father eventually followed and, from the time R.C. was about three until she was about seven, she lived with Collins but would at times stay with the father. Collins later left R.C. in Arambula and Young's care when she had to go back to California to visit her ill mother. The father then "became involved," which prompted Arambula and Young to file their guardianship petition.

Appleton initially recommended that the court appoint Arambula and Young as guardians for R.C. But after Arambula and Young indicated they no longer sought guardianship and agreed that Collins should be R.C.'s guardian, Appleton recommended that the court appoint Collins.

About eight months before trial, on January 18, 2023, the father's counsel moved to appoint a litigation GAL for him. The trial court denied the motion without prejudice and counsel did not renew it.[1]

---

[1] Shortly before trial, the father's counsel moved, not for a GAL, but to withdraw based on a "somewhat equivocal" request from the father, and counsel indicated that he had not had a lot of contact with the father. The court denied the request without prejudice, and counsel later renewed it, stating that "the issues that I do think need to be discussed, I'm not able to get a response [from the father] on those issues." The court deferred the matter until trial and, when it reminded the father's attorney of the request to withdraw at the outset of trial, counsel did not renew the motion.

Appleton, Arambula, Young, Collins, and the father testified at trial, after which the court appointed Collins as R.C.'s full guardian. The court also ordered that there be no visitation between the father and R.C. The father appeals.

## II. ANALYSIS

### A. Failure to Appoint Litigation GAL

The father argues that reversal is required because the trial court erred by not appointing a litigation GAL for him or, at least, holding a hearing on whether to appoint one. We disagree.

"When an incapacitated person is a party to an action in the superior courts he or she shall appear by guardian, or if he or she has no guardian, . . . the court shall appoint one to act as [GAL]." RCW 4.08.060. A court properly appoints a litigation GAL for a party "when reasonably convinced that [the] party . . . is not competent, understandingly and intelligently, to comprehend the significance of the legal proceedings and the effect and relationship of such proceedings in terms of the best interests of such party." *Graham v. Graham*, 40 Wn.2d 64, 66-67, 240 P.2d 564 (1952). We review a trial court's determination of the need for a GAL for an abuse of discretion. *Vo v. Pham*, 81 Wn. App. 781, 784, 916 P.2d 462 (1996). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *In re Marriage of Kovacs*, 121 Wn.2d 795, 801, 854 P.2d 629 (1993).

Here, it is true that there was information in the record based on which the trial court could reasonably have inquired further into the father's competency. For example, Arambula and Young stated in their guardianship petition that the father

"clearly has an undiagnosed mental impa[ir]ment that is not being treated" and "can act delusional." Additionally, R.C.'s GAL indicated at a hearing that the father had been committed to Fairfax Hospital.

Nevertheless, the trial court did not abuse its discretion by denying the father's request for a litigation GAL. The court did so because it "require[d] more information regarding the capacity of the [father]." This finding was not manifestly unreasonable. In support of the father's motion, counsel stated only that a litigation GAL "would be needed and helpful in order to move forward" and that "[t]here is *concern* that the client cannot adequately assist the undersigned counsel in order to adequately prepare for trial." But counsel did not address the *Graham* standard, much less provide any supporting facts related to that standard. Furthermore, the denial was without prejudice, so the father was not prevented from re-raising the issue with more evidence. Because he did not do so, we have no further decision on the matter to review. *Cf.* RAP 2.1(a) ("decision" under review "refers to rulings, orders, and judgments of the trial court").

To that end, the father also argues that the trial court abused its discretion by not appointing *sua sponte* a GAL later in the proceedings or holding a hearing on whether to do so. Citing *Vo*, the father contends that the trial court was required to do so *sua sponte* based on the evidence adduced at trial and the nature of the father's testimony. But *Vo* is distinguishable.

There, the suspected incompetent party, Susan Partridge, was representing herself *pro se*, even though the trial court later found that she "was not qualified to do so." *Vo*, 81 Wn. App. at 789. Partridge exhibited "bizarre" behavior, including

4

by testifying through her "second personality, a little girl named 'Barbara,' who controlled Partridge at times." *Id.* at 787. "Barbara" would even interrupt as if she was a third person addressing Partridge as "Susan." *Id.* at 789. And the trial court found that Partridge spoke rationally and intelligently and understood the significance of the proceedings only "[a]t times during the trial." *Id.*

Here, by contrast, the father was represented by counsel. And although the trial court found that the father was suffering from mental health issues and cited his "delusional thinking," conspiracy theories, and temper, the court's findings did not imply—as they did in *Vo*—that the father was not competent or could not understand the significance of the legal proceedings. Indeed, counsel confirmed at the outset of trial that the father understood the trial was about whether Collins should be appointed guardian over R.C., and that he was still objecting. Counsel also stated that the father believed his home would accommodate R.C. and he was capable of taking care of her and providing for her material needs.

Consistently with those representations, the gist of the father's own testimony was clear: he has stable housing, and is in high demand for employment, Collins and Arambula were lying about his treatment of R.C., and he was perfectly capable of caring for her, even if his testimony was rambling, self-aggrandizing, and often tangential. In short, while the father may have had mental health issues which affected his ability to care for R.C. and to present well at trial, the father fails to show that the trial court abused its discretion by not *sua sponte* finding him *incompetent* at the time of trial.

The father disagrees and relies on *Graham* for the proposition that

5

"[e]vidence establishing a parent suffers from an untreated mental health condition which impacts his ability to function, is sufficient to trigger an inquiry into whether a GAL need be appointed." In *Graham*, the trial court *sua sponte* appointed a GAL for the mother in a proceeding to determine whether to eliminate her visitation. 40 Wn.2d at 66. The mother opposed the appointment and applied to the Washington Supreme Court for a writ of prohibition. *Id.* The only issue before that court was whether it was within the superior court's authority to appoint a GAL *sua sponte*. *Id.* The court confirmed that it was but that the mother was entitled to a hearing to defend her competency. *Id.* at 68. Although the court stated it was "proper and desirable" for courts to appoint a GAL for a party when the court is reasonably convinced the party is not competent, *id.* at 66, the court did not hold, as the father suggests, that it would have been an abuse of discretion for the trial court *not* to hold a hearing on whether to appoint a GAL. Therefore, we are not persuaded that *Graham* requires reversal.

B.    Ineffective Assistance of Counsel

The father next argues that counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), for not renewing the request for a litigation GAL. Even assuming without deciding that *Strickland* applies in the minor guardianship context, we disagree.

*Strickland* established the standard for evaluating claims that a criminal defendant's counsel was so ineffective as to deprive the defendant of the Sixth Amendment right to counsel under the United States Constitution. *See id.* at 687-88. To prevail on such a claim, the defendant must show both that (1) counsel's

performance was deficient and (2) the deficient performance prejudiced the defense. "Failure to make the required showing of *either* deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700 (emphasis added). Furthermore, to establish deficient performance, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 76 S. Ct. 158, 100 L. Ed. 83 (1955)).

The father fails to overcome this presumption. As noted, counsel conferred with the father at the outset of the trial moved to appoint a litigation GAL, but then represented that the father understood the nature of the proceedings and still objected to guardianship. His counsel had, thus, put forth his client's position and preserved all objections. The record does not reveal what counsel knew about the father's competency at the time of trial, and on the record presented, we cannot rule out that counsel had legitimate strategic reasons for not renewing the request for a litigation GAL then. Accordingly, the father does not show that reversal is warranted. *Cf. id.* at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, *and to evaluate the conduct from counsel's perspective at the time.*" (emphasis added)).

C.    Prohibition on Visitation

Finally, the father argues that the trial court erred by prohibiting visitation between him and R.C. Again, we disagree.

We review a minor guardianship order for abuse of discretion. *In re*

7

*Guardianship of L.C.*, 28 Wn. App. 2d 766, 772, 538 P.3d 309 (2023). "The court, as part of an order appointing a guardian for a minor, shall state rights retained by any parent of the minor, which shall preserve the parent-child relationship through an order for parent-child visitation and other contact, *unless the court finds the relationship should be limited or restricted under RCW 26.09.191.*" RCW 11.130.215(4) (emphasis added).

Here, the trial court prohibited visitation after finding that the father "neglected [his] parental duties" and "has a long-term emotional or physical problem that gets in the way of [his] ability to parent." *Cf.* RCW 26.09.191(3)(a)-(b) (authorizing limitation of parent-child relationship based on "[a] parent's neglect or substantial nonperformance of parenting functions" and "[a] long-term emotional or physical impairment which interferes with the parent's performance of parenting functions"). The father asserts that the record does not support these findings because his erratic behavior and yelling were directed only at people *other than* his daughter. Accordingly, the father argues, he should be entitled to at least supervised virtual visitation and, "[i]f a supervisor found [his] behavior problematic during such a visit, the electronic communication could simply be ended."

We cannot say the court abused its discretion by rejecting such an argument. As the court held, if such visitation was permitted, R.C. would already have been exposed to her father's behavior, which "scared" her, even when it was not directed at her. Appleton testified that R.C. reported that her father "yells a lot, yells at people and sometimes just yells" and that, every time Appleton brought up residing with the father, "R.C.'s body language . . . would be very closed off and

fearful," so Appleton "did not push her too hard due to how affected . . . [R.C.] became." The father does not show that it was manifestly unreasonable under these circumstances to prohibit all forms of visitation.

III.     CONCLUSION

We affirm.

_Díaz, J._

WE CONCUR: